**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WE SHALL OVERCOME FOUNDATION
and BUTLER FILMS, LLC, on behalf of
themselves and all others similarly situated,

                     Plaintiffs,

      v.

THE RICHMOND ORGANIZATION, INC.
(TRO INC.) and LUDLOW MUSIC, INC.,

                    Defendants.

C.A. No. 16-cv-02725-DLC

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Mark C. Rifkin
rifkin@whafh.com
Randall S. Newman
newman@whafh.com
Gloria K. Melwani
melwani@whafh.com
270 Madison Ave.
10th Floor
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiffs and the Class*

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................. 4

III. LEGAL ARGUMENT ........................................................................................... 11

    A.   Standards for Summary Judgment ........................................................... 11

    B.   Defendants Are Not Entitled to the
        Limited Protection Under the Copyright Act ........................................... 12

        1.   Trivial, Insignificant and Unoriginal Changes
            to the Song's Lyrics ..................................................................... 16

        2.   Trivial, Insignificant and Unoriginal Change
            to the Song's Melody .................................................................... 19

        3.   Divesting Publications of the Verse 1/5 Lyrics and Melody ........ 21

    C.   Both Copyrights Are Invalidated By
        Ludlow's Fraud on the Copyright Office ................................................. 23

IV.  CONCLUSION ..................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>**CASES**</u>                                                                                                                     <u>Page(s)</u>

*16 Casa Duse, LLC v. Merkin,*
   791 F.3d 247 (2d Cir. 2015)...........................................................................................13

*Acuff–Rose Music, Inc. v. Jostens, Inc.,*
   155 F.3d 140 (2d Cir. 1998).....................................................................................18, 19

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).......................................................................................................11

*Bell v. Blaze Mag.,*
   No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783 (S.D.N.Y. Mar. 15, 2001)...........18, 19

*Cmty. for Creative Non–Violence v. Reid,*
   490 U.S. 730 (1989).................................................................................................13, 21

*Cordon Holding B.V. v. Northwest Publ'g Corp.,*
   No. 98 Civ. 4797 (AGS), 2002 U.S. Dist. LEXIS 6111 (S.D.N.Y. Apr. 8, 2002) ....................22

*Eckes v. Card Prices Update,*
   736 F.2d 859 (2d Cir. 1984)..........................................................................................23

*Edwards v. Raymond,*
   22 F. Supp. 3d 293 (S.D.N.Y. 2014).........................................................................18, 19

*Gardenia Flowers, Inc. v. Joseph Markovits, Inc.,*
   280 F. Supp. 776 (S.D.N.Y. 1968)..................................................................................21

*Gibson Tex, Inc. v. Sears Roebuck & Co.,*
   11 F. Supp. 2d 439 (S.D.N.Y. 1998)...............................................................................24

*Gummo v. Village of Depew,*
   75 F.3d 98 (2d Cir.), *cert. denied*, 517 U.S. 1190 (1996).........................................................11

*Italian Book Co. v. Rossi,*
   27 F.2d 1014 (S.D.N.Y. 1928)........................................................................................15

*James W. Newton v. Diamond,*
   204 F. Supp. 2d 1244 (C.D. Cal. 2002) ....................................................................20, 21

*Jean v. Bug Music, Inc.,*
   No. 00 Civ. 4022 (DC), 2002 U.S. Dist. LEXIS 3176 (S.D.N.Y. Feb. 27, 2002)...............20, 21

*Keeling v. Hars,*
    809 F.3d 43 (2d Cir. 2015)..................................................................................14

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    136 S. Ct. 1979 (2016)................................................................................13, 15

*L. Batlin & Son, Inc. v. Snyder,*
    536 F.2d 486 (2d Cir. 1976).............................................................13, 14, 15, 19

*Martinson v. Menifee,*
    No. 02 Civ. 9977 (LTS), 2007 U.S. Dist. LEXIS 52591 (S.D.N.Y. July 18, 2007)..................11

*Marya v Warner/Chappell Music, Inc.,*
    131 F. Supp. 3d 975 (C.D. Cal. 2015) ...................................................................12

*Matthew Bender & Co., Inc. v. West Publ'g Co.,*
    158 F.3d 674 (2d Cir. 1998)...............................................................................15

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
    134 S. Ct. 843 (2014) .....................................................................................12

*Mills Music, Inc. v. Cromwell Music, Inc.,*
    126 F. Supp. 54 (S.D.N.Y. 1954) .........................................................................23

*National Comics Publs. v. Fawcett Publs., Inc.,*
    191 F.2d 594 (2d Cir. 1951)...............................................................................22

*Norden v. Oliver Ditson Co.,*
    13 F. Supp. 415 (D. Mass. 1936) .........................................................................20

*Papa's-June Music, Inc. v. McLean,*
    921 F. Supp. 1154 (S.D.N.Y. 1996).......................................................................21

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,*
    No. 96 Civ. 4126 (RWS), 2000 U.S. Dist. LEXIS 10394 (S.D.N.Y. July 25, 2000) .................23

*Poindexter v. EMI Record Group, Inc.,*
    No. 11 Civ. 559 (LTS)(JLC),
    2012 U.S. Dist. LEXIS 42174 (S.D.N.Y. Mar. 27, 2012) .......................................21

*Pyatt v. Raymond,*
    No. 10 Civ. 8764 (CM), 2011 U.S. Dist. LEXIS 55754 (S.D.N.Y. May 19, 2011)..................19

*Russ Berrie & Co., Inc. v. Jerry Elsnere Co., Inc.,*
    482 F. Supp. 980 (S.D.N.Y. 1980)........................................................................24

iii

*Sanga Music, Inc. v. EMI Blackwood Music, Inc.*,
  55 F.3d 756 (2d Cir. 1995).................................................................................22

*Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*,
  363 F.3d 177 (2d Cir. 2004)..............................................................................13

*Silverman v. CBS, Inc.*,
  870 F.2d 40 (2d Cir. 1989)................................................................................14

*Stewart v. Abend*,
  495 U.S. 207 (1990).........................................................................................14

*Sunset Lamp Corp. v. Alsy Corp.*,
  698 F. Supp. 1146 (S.D.N.Y. 1988)............................................................21, 22

*TCA TV Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016)..............................................................................12

*TufAmerica, Inc. v. Codigo Music LLC*,
  162 F. Supp. 3d 295 (S.D.N.Y. 2016)...............................................................14

*Universal Film Mfg. Co. v. Copperman*,
  212 F. 301 (S.D.N.Y. 1914)..............................................................................21

*Waldman Publ'g Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994)................................................................................14

*Weissmann v Freeman*,
  684 F. Supp. 1248 (S.D.N.Y. 1988)..................................................................14

*We Shall Overcome Foundation v. Richmond Organization, Inc. ("WSO")*,
  No. 16-2725 (DLC),
  2016 U.S. Dist. LEXIS 160965 (S.D.N.Y. Nov. 21, 2016) ............................. *passim*

*West Publishing Co. v. Edward Thompson Co.*,
  169 F. 833 (C.C.D.N.Y. 1909)..........................................................................22

## STATUTES & RULES

Copyright Act of 1976 ...........................................................................12, 19, 21
  17 U.S.C. § 101 ...................................................................... 8, 13-14, 15
  17 U.S.C. § 102(a) .........................................................................13
  17 U.S.C. § 103 ...............................................................................14

Fed. R. Civ. P.
  56(a) ...................................................................................................................11
  56(c)(1)(B) .........................................................................................................11

U.S. Const. art. I, § 8, cl. 8...............................................................................12, 15

## <u>OTHER AUTHORITIES</u>

1 Melville B. Nimmer and David Nimmer, Nimmer on Copyright
(Matthew Bender, Rev. Ed.) ...........................................................................13, 18

*New Oxford American Dictionary* (Oxford Univ. Press, 3d ed. 2010)..........................................17

Plaintiffs, We Shall Overcome Foundation ("WSOF") and Butler Films, LLC ("Butler"), on behalf of themselves and all others similarly situated, by their attorneys, hereby submit this Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment.

## I.   <u>INTRODUCTION</u>

This is an action to extinguish Defendants' claim to own *We Shall Overcome* (the "Song") under two bogus copyrights and to return the Song to the public. The Song is a derivative work: an adaptation of an African-American spiritual with ***the same melody and nearly the same lyrics*** from the late 19th or early 20th century. The spiritual itself was an adaptation of a much earlier work, an 18th century hymn called *O Sanctissima*, a public domain melody. The first verse of *We Shall Overcome*[1] was used as an inspirational song by African Americans and then as a protest song by the labor movement in the early part of the 20th century. By the 1950s, *We Shall Overcome* became the unofficial anthem of the Civil Rights Movement, and the Song has since been an important part of American culture and politics.

Defendants, The Richmond Organization, Inc. ("TRO"), and Ludlow Music, Inc. ("Ludlow"), claim to own the copyright to *We Shall Overcome*, including its melody and lyrics, under two narrow, expressly limited copyrights for derivative works obtained by Ludlow in 1960 and 1963.[2] ***Neither of those two narrow copyrights covers the Song's melody or the familiar lyrics of Verse 1/5***. Plaintiffs seek a judicial determination that those copyrights do ***not*** cover the Song's melody or those lyrics and a declaration that the melody and familiar lyrics of Verse 1/5

---

[1] The first and fifth verses have the exact same lyrics. For clarity, the identical lyrics of both verses are referred to as "Verse 1/5."

[2] Because of Defendants' copyright claim, Plaintiff WSOF paid $45.50 for a mechanical license and cannot release a video including the Song. SOF ¶ 179. "SOF ¶ __" refers to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment filed concurrently herewith and to the evidence cited therein. Plaintiff Butler paid $15,000 for a synchronization license to include no more than ten seconds of the Song in the movie "Lee Daniel's The Butler." SOF ¶ 176.

are in the public domain. In addition, to the extent the copyrights cover other elements of the Song (including both musical arrangements and six additional verses), Plaintiffs seek to invalidate them based on Defendants' fraud upon the Copyright Office.

Sheet music with the melody and lyrics from the African-American spiritual, as well as two additional verses, was first published in September 1948 as "We Will Overcome," in Vol. 3, No. 8 of *People's Songs*, by People's Songs, Inc. ("PSI"), of which Pete Seeger ("Seeger"), one of the purported authors of the Song, was National Director. PSI identified the author of the work as follows: "By FTA-CIO Workers Highlander Students," referring to the FTA workers and the Congress of Industrial Organizations (CIO) and to the Highlander Folk School. Regardless of who may have contributed any new work to the Song, the changes from the version published in 1948 are trivial and inconsequential. Defendants claim only the following "changes" to that work: (1) two new words, "shall" and "deep," were added to Verse 1/5; and (2) a quarter-note and two eighth-notes were added to the melody. The version of the Song copyrighted by Ludlow in 1960 and 1963 and the song published by PSI in 1948 are ***virtually the same***; the 1960/1963 version has only trivial differences from the 1948 copy.

Defendants have no admissible, direct evidence (such as sheet music or a manuscript) to prove that any of the four purported authors changed the melody or the lyrics of Verse 1/5 from the pre-existing African-American spiritual. Although they admit that the Song is a derivative work, they cannot accurately identify the prior work. All four "authors" claim to have ***learned the Song from others***. Only one of the "authors," Seeger, ever claimed to have contributed any new material to the Song. If there is any admissible evidence that Seeger added a word or two to Verse 1/5, he called the Song a "Negro spiritual" and later questioned whether he had, in fact, changed any lyrics. When Seeger no longer could bear to take credit for work he knew he did ***not***

do, he disavowed any copyright in the Song and demanded to be removed from the copyright.

Defendants cannot possibly meet their burden to prove they own a copyright to one of the country's most important songs or that anyone who plays the Song's melody or sings the iconic lyrics of Verse 1/5 infringes on whatever limited copyright they may own in that derivative work. There is no admissible evidence to prove what parts of the Song – if any – were written by any of the four purported authors as an original work of authorship. Defendants do not know who wrote what, although they do claim – with only scant proof to support it – that Seeger (who was not even listed as an author on the 1960 copyright) wrote the words "shall" and "deep" in Verse 1/5.

To the contrary, there is abundant evidence – much of it writings and recordings by the four "authors" themselves – that proves none of them wrote the Song's melody or the iconic lyrics of Verse 1/5, and they did not write the lyrics of at least four other verses of the Song that are subject to Ludlow's bogus copyrights. Rather, all four "authors" admitted they *learned* the Song from others who played and sang it long before 1960, and they *taught* what they learned to each other.[3] Learning and teaching are *not* the same as writing, and they are *not* entitled to copyright protection. The trivial changes to the Song are not sufficiently original to be protected by a copyright. *See We Shall Overcome Found. v. Richmond Org., Inc.*, No. 16-cv-2725(DLC), 2016 U.S. Dist. LEXIS 160965, at *13 (S.D.N.Y. Nov. 21, 2016) ("*WSO*") (derivative work must contain "variation that is *more than merely trivial*") (citation omitted; emphasis added).

For all these reasons, as well as other reasons explained more fully below, the Court should grant summary judgment for Plaintiffs and give this Song back to the public. The time

---

[3] As Seeger noted in his 1993 memoir, "Where Have All the Flowers Gone," all the people responsible for creating the Song – which became the unofficial anthem of the Civil Rights Movement – were African American women, while all the people who took credit for writing it and who claim to own the copyright are white men. Zilphia Horton ("Horton"), another of the four purported authors of the Song, never claimed any credit herself.

has come to end Defendants' undeserved trophy copyright.

## II.   FACTUAL BACKGROUND

The Song is a derivative work adapted from an earlier work: an African-American spiritual with the same melody and nearly identical lyrics from the late 19th or early 20th century. SOF ¶¶ 1, 2, 12, 17, 26, 32 & 33. Both songs are derived from an earlier work, an 18th century hymn called *O Sanctissima*, a public domain melody that was used by Beethoven in the early 19th century. SOF ¶¶ 140-41.

The well-known lyrics of *We Shall Overcome* are as follows:

> We shall overcome
> We shall overcome
> We shall overcome some day
> Oh deep in my heart, I do believe
> We shall overcome some day

SOF ¶ 63. The nearly identical lyrics of the African-American spiritual, sung to the same melody (derived from *O Sanctissima*), are:

> We (or I) will overcome
> We (or I) will overcome
> We (or I) will overcome some day
> Oh deep (or down) in my heart, I do believe
> We (or I) will overcome some day

SOF ¶¶ 32-33.

The first known printed reference to "We Will Overcome Some Day," in the February 1909 edition of the *United Mine Workers Journal*, referred to performances of the Song in 1908 and much earlier. SOF ¶ 1. The *United Mine Workers Journal* stated: "that good old song was sung at every meeting, 'We Will Overcome Some Day.'" *Id.*

In 1946, Horton began work on a songbook for the Congress of Industrial Organizations. SOF ¶ 6. On April 16, 1948, a music publisher sent sheet music for three songs, including "We Will Overcome," to Horton for inclusion in the songbook. SOF ¶¶ 10-11. The sheet music for

"We Will Overcome" attributed the melody to an unnamed "Old Negro spiritual" and the words to "Highlander students FTA term '46." SOF ¶ 12.[4] Horton was not identified as the author of any part of the Song. Horton included "We Will Overcome" in the songbook she edited, entitled *Sing Out Brother*, just as it was sent it to her, including crediting ***others*** for writing the melody and the lyrics of the song. SOF ¶¶ 13-14. The sheet music in *Sing Out Brother* – which identified the melody as an unnamed "Old Negro spiritual" and attributed the words to "Highlander students FTA term '46" – is the earliest known written copy of the Song.

In September 1948, People's Songs, Inc. ("PSI"), of which Seeger was Chairman and an editor, printed "We Will Overcome" in Vol. 3, No. 8 of *People's Songs*, the periodical it published. SOF ¶¶ 8, 16-18. It included sheet music with the melody and lyrics from the African-American spiritual as well as two additional verses. SOF ¶ 18. Next to the title for "We Will Overcome," PSI identified the author of the musical composition as: "By FTA-CIO Workers Highlander Students," referring to the FTA workers and the CIO and to the Highlander Folk School. SOF ¶ 15. PSI wrote that the Song was "***learned*** by Zilphia Horton of the Highlander Folk School . . . from members of the CIO Food and Tobacco Workers Union." *Id.* (emphasis added).[5] *Id.* The September 1948 edition of *People's Songs* was registered with the Copyright Office under Reg. No. B184728. SOF ¶ 21. That copyright was never renewed, and consequently

---

[4]  African-American members of the Food, Tobacco, Agricultural, and Allied Workers ("FTA") union sang "We Will Overcome" while on strike in Charleston, South Carolina, which began on October 22, 1945. Some of those striking FTA workers attended the Highlander School in May 1946, where they ***taught*** the song to Horton. One of the striking FTA workers in Charleston was Lucille Simmons ("Simmons"), an African-American Gospel singer. Seeger said Simmons changed the word "I" to "We" in Verse 1/5. SOF ¶ 124. In 1989, Seeger wrote that Simmons was not named as an author of the Song in either the 1960 or 1963 copyrights because no one knew her name at the time. SOF ¶ 125. Carawan, Hamilton, and Myles Horton joined in Seeger's demand that Simmons be given credit for that change. SOF ¶ 121.

[5]  The description given in the 1948 edition of *People's Songs* is fully consistent with the author's credits on "We Will Overcome" included in *Sing Out Brother*.

it expired 28 years later, in 1976, by which point (if not sooner) the melody and lyrics of "We Will Overcome" undoubtedly entered the public domain. SOF ¶ 19.[6]

In 1952, Hootenanny Records released a 78-rpm phonograph record with *We Shall Overcome* on the B-side. SOF ¶ 26. *We Shall Overcome* was performed by the Jewish Young Folk-Singers, directed by Robert DeCormier. *Id.* The lyrics performed on the Hootenanny record are identical to the Verse 1/5 lyrics printed on Ludlow's 1960 and 1963 deposit copies, except for the contraction "We'll" sung in the last line of the Song. SOF ¶ 24. The Jewish Young Folk-Singers also sang Verse 6 on the Hootenanny record. *Id.*

People's Artists Inc., which was a division of PSI and of which Seeger was National Director, issued a press release describing the Hootenanny record as follows: "The reverse side features the Jewish Young Folk-Singers, directed by Bob DeCormier, in a moving presentation of ***the Negro spiritual 'We Shall Overcome'***." SOF ¶¶ 25-27 (emphasis added).

Sometime around 1952,[7] an audio recording was made of Horton performing several songs, including "We Will Overcome." SOF ¶ 28. Horton introduced her performance of "We Will Overcome" as follows:

---

[6] On May 14, 2013, Lawrence Ferrara, Ph.D., a professor of music at New York University, prepared a musicological report (the "Ferrara Report") for Defendants regarding *We Shall Overcome*. SOF ¶ 64. According to the Ferrara Report, the "music and lyrics" of "We Will Overcome" published in *People's Songs* in 1948 are "***virtually the same***" as the music and lyrics of *We Shall Overcome*. SOF ¶ 65 (emphasis added). Defendants have relied upon the Ferrara Report to substantiate their claim to own a copyright in the Song. SOF ¶ 66.

For example, relying on the Ferrara Report, Defendants' counsel, Paul V. LiCalsi, Esquire, stated in a letter dated May 16, 2013, as follows: "'We Will Overcome' from the September 1948 edition of the publication *People's Songs* embodying 'the version of the song sung by members of the Food and Tobacco Workers Union, and ***learned*** by Zilphia Horton of the Highlander Folk School . . . is the ***precursor*** of 'We Shall Overcome' which was copyrighted in 1960." SOF ¶ 67 (emphasis added).

[7] The recording of Horton's performance is undated. However, Horton said on the recording that Huddie William Ledbetter, whom she referred to as "Ledbetter," died "about two years ago." SOF ¶ 30. Ledbetter died on December 6, 1949. SOF ¶ 31.

> And this is the song *We Will Overcome*. This is a song that **came from uh, Tobacco Workers**, it's a spiritual, I sang it for French Canadians in Canada, I sang it for people every . . . many different nationality groups and it's so simple and the idea is so sincere that it doesn't matter that **it comes from tobacco workers**, when I sing it for people it becomes their song.

SOF ¶ 32 (emphasis added to transcription). In addition to Verse 1/5, Horton also sang Verse 4 ("The Lord will see us through") in her 1952 performance. SOF ¶ 33.

In 1959, Vanguard Records released a phonograph record narrated by Charlton Heston entitled *Out of Egypt: The Story of Moses*, which included a performance of *We Shall Overcome* by The Robert DeCormier Chorale. SOF ¶¶ 40-41. The melody is identical to the melody of the African-American spiritual and of *We Shall Overcome*. SOF ¶¶ 40-45. The lyrics are also identical to Verse 1/5, except for the contraction "We'll" sung in the last line of the Song. *Id.*

On December 14, 1959, Cherry Lane Music, Inc. ("Cherry Lane"), a music publisher, registered a copyright (Reg. No. EU606164) for *Music for 1st 5 Books of Moses*. SOF ¶ 42. That work corresponded with the *Out of Egypt* phonograph record. *Id.* *Music for 1st 5 Books of Moses* included sheet music for *We Shall Overcome*. SOF ¶ 44. Cherry Lane's copyright covered the following work: "arr. & adapted w & m Bob Corman, pseud. of Robert De Cormier. NM: arr. & adapted w&m," meaning "arranged and adapted words and music." SOF ¶ 42. In its copyright application, Cherry Lane identified De Cormier as author of the "ARRANGEMENT + ADAPTATION OF WORDS AND MUSIC." *Id.*

In June 1960, Seeger and political activist Irwin Silber published Vol. 10, No. 2 of *Sing Out! The Folk Song Magazine* ("*Sing Out!*"), which included an article about Carawan by Silber entitled "He Sings for Integration." SOF ¶¶ 46-47. The article included the Song's lyrics:

> We shall overcome,
> We shall overcome,
> We shall overcome some day;
> Oh, deep in my heart,
> I do believe,

We shall overcome some day.

SOF ¶ 48.[8] The lyrics published by Seeger and Silber in Vol. 10, No. 2 of *Sing Out!* are **identical** to the Song's well-known lyrics. SOF ¶¶ 47-48 & 63.

On October 27, 1960, Ludlow filed a copyright Registration Application (Reg. No. EU645288) for the Song as an unpublished derivative work.[9] SOF ¶ 61. The Song included the same melody and virtually the same lyrics as the work published by PSI, the Hootenanny record, the Vanguard record, the work copyrighted by Cherry Lane, and the magazine published by Seeger and Silber. SOF ¶¶ 15, 23, 41, 44, 47 & 61-63. Ludlow registered the copyright not to protect its own original work or any original work of the purported authors named in the copyright application, but instead to lay false claim to a song they did not create.

In Paragraph 3 of the Registration Application for Reg. No. EU645288, Ludlow listed Horton (who died in April 1956 and who never claimed an author's credit for the Song during her lifetime), Hamilton, and Carawan as the authors of "New words & music Arrangement." SOF ¶¶ 55-56. In Paragraph 5(b) of the Registration Application, Ludlow described the new work as follows: "Original registration under title I'LL OVERCOME. Melody has been changed. Harmonization wholly original. Verses 2, 3, 4 of lead sheet attached all original." SOF ¶ 59. The 1960 Deposit Copy for Reg. No. EU645288 identified Horton, Hamilton, and Carawan as authors of "new words and music arrangement," *not* the melody or the well-known lyrics of Verse 1/5. SOF ¶ 55-57.

The Registration Application for Reg. No. EU645288 was false and misleading in at least four important respects:

---

[8] On June 1, 1960, Vol. 10, No. 2 of *Sing Out!* was registered by Sing Out, Inc. ("SOI"), with the Copyright Office under Reg. No. B845820. SOF ¶ 50.

[9] A derivative work is "a work based upon one or more preexisting works, such as a . . . musical arrangement." 17 U.S.C. § 101 (2017).

- *First*, the Song was not derived from any previously registered work called "I'll Overcome." There was no prior copyright registration for any song with that name. Defendants now contend that the work was actually C. Albert Tindley's song "*I'll Overcome Some Day*," copyrighted by Hall-Mack Co. on November 1, 1900. SOF ¶¶ 62 & 112. However, the two works are unrelated.[10] Indeed, when he was General Manager of TRO, Al Brackman admitted that "the **melody and lyrics** of [Tindley's] old hymn are **completely different**" from those of *We Shall Overcome*. SOF ¶ 109-11 (emphasis added).

  If Ludlow identified any prior work in the Registration Application, it should have been PSI's 1948 publication, Cherry Lane's 1959 publication, SOI's 1960 publication, the original African-American spiritual, or *O Sanctissima*, the melody and lyrics of which are all identical or nearly identical to *We Shall Overcome*. Those unnamed works, not "I'll Overcome Some Day," were the original works from which *We Shall Overcome* was derived.

- *Second*, the Song's melody was unchanged from PSI's 1948 publication, from Cherry Lane's 1959 publication, from the union workers' song that Horton learned, and the original African-American spiritual from which they are all derived.

- *Third*, the authors identified in the copyright application were not authors of the work. Carawan's wife later said (and Carawan did not correct her) that Verse 3, "Truth will make us free" was written by Myles Horton. SOF ¶¶ 76-77. Verse 4 ("The Lord will see us through") was included in *Sing Out Brother* in 1946, where Horton was attributed it to "Highlander Students FTA Term '46," and also appeared in *People's Songs* in 1948. SOF ¶¶ 78-82. Horton sang Verse 4 in her 1952 performance and attributed authorship to tobacco workers. SOF ¶ 28-33 (at 111:18-25; 112:1-2; 112:6-12). Defendants cannot identify any other author of Verse 3 or Verse 4. SOF ¶¶ 75 & 78.

- And *fourth*, although Ludlow stated that the Song was previously registered but unpublished, in fact the Song was published in *People's Songs* in 1948. SOF ¶ 15.

The April-May 1961 edition of *Sing Out!* included a lead sheet for *We Shall Overcome*, including the Song's melody and the Verse 1/5 lyrics.[11] SOF ¶ 89. SOI described the Song as follows:

> This song . . . is an adaptation of an old hymn. A number of years ago, members of the CIO Food and Tobacco Workers Union **introduced** the song at the

---

[10] *We Shall Overcome* is written in the G-Major heptatonic scale in 4/4, or common time, while "I'll Overcome Some Day" has a completely different melody written in the pentatonic scale in 3/4 time. The lyrics of the two songs also are entirely different.

[11] Although the title of the Song printed in *Sing Out!* was "We **Shall** Overcome," the printed lyrics were "We **will** overcome," *see* SOF ¶ 97, demonstrating the interchangeability of the two words.

Highlander Folk School in Monteagle, Tennessee. At the height of the Montgomery (Alabama) bus boycott led by Rev. Martin Luther King [between 1955 and 1956], it was sung by Negroes in the face of a hostile mob – and television cameras caught the simple, moving dignity of the song and the people who sang it for the entire nation to see and hear.

SOF ¶ 91 (emphasis added). SOI published the Song without attributing authorship to Horton, Carawan, Hamilton, or Seeger or identifying the 1960 copyright, even though Seeger was a shareholder of SOI and an associate editor of the magazine. SOF ¶¶ 85-90.

On October 8, 1963, Ludlow filed Registration Application (Reg. No. EP179877) for *We Shall Overcome* as a derivative work. SOF ¶ 93. The Song included the same melody as the African-American spiritual and work previously registered by Cherry Lane in 1959 and the same lyrics in the work registered by Cherry Lane, by SOI in 1960, and by SOI in 1961, but Ludlow failed to mention any of those works in the application. SOF ¶¶ 15, 23, 41, 44, 47 & 61-63 & 94. Ludlow did not identify the original work from which the Song was derived. SOF ¶¶ 93 & 98.

In Paragraph 3 of the Application for Reg. No. EU645288, Ludlow listed Horton, Hamilton, Carawan, and Seeger as authors of "New words and music adaptation." SOF ¶ 97. Ludlow did not specify what was written by either of the authors. SOF ¶ 93. And it failed to identify what additional new work Horton, who died in 1956, added to the Song between 1960 and 1963. *Id*. In Paragraph 5(b), Ludlow identified the new matter as: "Arr. for voice and piano with guitar chords plus completely new words in verses 6, 7, and 8. The addition of Pete Seeger's name to writer credits is new." SOF ¶ 99.

Like the deposit copy for the 1960 copyright (Reg. No. EU645288), the deposit copy for Reg. No. EP179877 identified Horton, Hamilton, Carawan, and Seeger as authors of "New Words and Music Adaptation," ***not*** Song's melody or the well-known lyrics of Verse 1/5. SOF ¶¶ 93 & 97. The 1963 copyright added three new verses, Verses 6, 7, and 8, but at least two verses were pre-existing and written by others. The lyrics in Verse 6 were included on the 1952

10

recording of the Song by the Jewish Young Folk-Singers and were published by SOI in the April-May 1961 edition of *Sing Out!* without crediting authorship to Horton, Hamilton, Carawan, or Seeger. SOF ¶¶ 89 & 102. Defendants admit they do not know who wrote Verse 6. SOF ¶ 107. Carawan said several times that Verse 7 was written by an African-American woman named Jamila Jones (a/k/a Esther Dozier) during a raid on the Highlander School in 1959. SOF ¶ 103-06. Waldemar Hille, a pianist and composer who edited *People's Songbook*, said he wrote Verse 6 of the Song. SOF ¶ 138.

## III.   LEGAL ARGUMENT

### A.   Standards for Summary Judgment

A party may move for summary judgment on any claim or defense, or any part of a claim or defense. Fed. R. Civ. P. 56(a). The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The movant may prevail by showing that the adverse party lacks sufficient admissible evidence to support a finding in its favor at trial. *See* Fed. R. Civ. P. 56(c)(1)(B).

When moving for summary judgment against a party that bears the ultimate burden of proof on a particular claim, the moving party need only "draw attention to the non-moving party's inability to prove each essential element of his case." *Martinson v. Menifee*, No. 02 Civ. 9977 (LTS), 2007 U.S. Dist. LEXIS 52591, at *34-35 (S.D.N.Y. July 18, 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (party with ultimate burden of proof must set forth sufficient evidence to support finding that burden of persuasion can be met at trial)). To defeat summary judgment, the opposing party may only rely upon evidence that would be admissible at trial. *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied*, 517 U.S. 1190 (1996) (citing Fed. R. Civ. P. 56(e)).

11

While the plaintiff ordinarily bears the burden of proof, the default rule does not apply in declaratory judgment cases involving intellectual property. For example, in *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014), when the plaintiff sought a declaratory judgment that its products did not infringe the defendant's patents, the Supreme Court placed the burden of proof on the patent holder, even though it was nominally the defendant. The Supreme Court said that "declaratory judgment suits like the one at issue here" are "exception[s] to the basic rule." *Id.* at 851. In *Marya v Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 983-84 (C.D. Cal. 2015), an action to end the copyright to *Happy Birthday*, the Central District of California relied on *Medtronic* to place the burden of proof on the defendants. As the court held, "just as in *Medtronic*, there is no reason to relieve the alleged owners of the intellectual property of the usual burden of proof just because they are nominally the defendants in this declaratory judgment action." *Id.* at 984 (citing *Medtronic*, 134 S. Ct. at 851).

As purported owners of the copyright, Defendants bear the burden of proof that their copyrights cover the Song's melody and the familiar lyrics of Verse 1/5.[12] For all the reasons that follow, Defendants have insufficient admissible evidence to meet their burden of proof at trial.

### B.    Defendants Are Not Entitled to the Limited Protection Under the Copyright Act

Copyright protection is not unlimited. The Copyright Act "affords copyright protection to promote not simply individual interests, but – in the words of the Constitution – 'the progress of science and useful arts' for the benefit of society as a whole." *TCA TV Corp. v. McCollum*, 839 F.3d 168, 177 (2d Cir. 2016) (quoting U.S. Const. art I, § 8, cl. 8). The act balances two

---

[12] At a scheduling conference on December 16, 2016, the Court recognized that because Defendants are "claiming protection of the copyright," they bear the ultimate burden of proof and, accordingly, the Court required Defendants to produce their expert reports before Plaintiffs were required to produce theirs. *See* Tr. Dec. 16, 2016, at 13:6-22.

sometimes competing purposes. The "'copyright law ultimately serves the purpose of enriching the general public through access to creative works.' . . . The statute achieves that end by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994)). Copyright protection cannot be granted if doing so unreasonably inhibits new artistic expression.

As this Court held in *WSO*:

> Copyright protection extends to "original works of authorship fixed in any tangible medium of expression" such as "musical works, including any accompanying words." 17 U.S.C. § 102(a)(2); *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 256 (2d Cir. 2015). "The *sine qua non* of copyright is originality." *N.Y. Mercantile Exch., Inc. v. InterContinentalExchange, Inc.*, 497 F.3d 109, 113 (2d Cir. 2007); *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).

2016 U.S. Dist. LEXIS 160965, at *12.

The Copyright Act only protects original "works of authorship." 17 U.S.C. § 102(a); *16 Casa Duse, LLC*, 791 F.3d at 256. An author is one who "actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 737 (1989); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004). One who simply copies – or learns – from another may not claim protection as an author. *L. Batlin & Son. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976); *see also* 1 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 1.06[A] (Matthew Bender, Rev. Ed.).

The subject-matter of copyright includes derivative works, defined as works "based upon one or more preexisting works" and "consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." 17 U.S.C. §

101; *Keeling v. Hars*, 809 F.3d 43, 48 n.3 (2d Cir. 2015).[13] However, copyright protection for derivative works extends "only to the material contributed by the author of such [new] work." 17 U.S.C. § 103; *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994); *Silverman v. CBS, Inc*., 870 F.2d 40, 49 (2d Cir. 1989) (derivative work copyrights "secure protection only for the incremental additions of originality contributed by the authors of the derivative works").[14]

To warrant copyright protection, the new material in a derivative work must show "'***more than a modicum of originality***. This has been interpreted to require a ***distinguishable variation that is more than merely trivial***.'" *WSO*, 2016 U.S. Dist. LEXIS 160965, at *13 (emphasis added) (quoting *Waldman*, 43 F.3d at 782). Only non-trivial, original features contributed by the author of a derivative work are entitled to copyright protection. *Weissmann v Freeman*, 868 F.2d 1313, 1321 (2d Cir 1989) (author must contribute "something more than a 'merely trivial' variation" of the original work); *L. Batlin & Son, Inc.,* 536 F.2d at 491 (2d Cir.) (en banc), *cert. denied*, 429 U.S. 857 (1976)). "'To extend copyrightability to minuscule variations would simply put a ***weapon for harassment*** in the hands of mischievous copiers intent on appropriating and

---

[13] Unless the prior work is in the public domain, the author of a derivative work must obtain authorization from the author of the prior work to make the derivative work. *Stewart v. Abend*, 495 U.S. 207, 232 (1990) ("Congress . . . intended that a derivative work author may not employ a copyrighted work without the [original] author's permission"); *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 314 (S.D.N.Y. 2016) (Ramos, J.) (same). Except for songwriter's contracts with the four purported authors, which cannot relate to any pre-existing work, Defendants have identified ***no other authorization for the Song***. SOF ¶ 181.

[14] Of course, a copyright claimant acquires no greater rights in a derivative work than what he or she claims. In defining the scope of the new work covered by its application for the 1960 copyright, Ludlow identified the new work as: "Melody has been changed. ***Harmonization wholly original. Verses 2, 3, 4 of lead sheet attached all original***." SOF ¶ 59 (emphasis added). In defining the scope of the new work covered by its 1963 application, Ludlow identified the new work as: "Arr. for voice and piano with guitar chords plus ***completely new words in verses 6, 7, and 8***." SOF ¶ 99 (emphasis added). The iconic lyrics are in Verse 1/5, but Ludlow made ***no claim to the lyrics in Verse 1/5*** in either copyright application. *Id.*

monopolizing public domain work.'" *WSO*, 2016 U.S. Dist. LEXIS 160965, at *13 (emphasis added) (quoting *Batlin*, 536 F.2d at 492). Such a "weapon for harassment" is fundamentally inconsistent with the purpose of the Copyright Act to "promote the progress of science and useful arts."[15] *See* U.S. Const. art. I, § 8, cl. 8; *Kirtsaeng*, 136 S. Ct. at 1986. Defendants' unfounded copyright claim is just such a "weapon for harassment."[16]

In Ludlow's 1960 registration, it described the new work as: "Original registration under title "I'LL OVERCOME." Melody has been changed. Harmonization wholly original. Verses 2, 3, 4 of lead sheet attached all original." SOF ¶ 59.[17] In its 1963 application, Ludlow described the new work under that copyright as: "Arr. for voice and piano with guitar chords plus

---

[15] In *Batlin*, the Second Circuit held that protection for a derivative work requires a "distinguishable variation" from the preexisting work and a "minimal element of creativity over and above the requirement of independent effort." 536 F.2d at 490. *See also Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674, 680 (2d Cir. 1998) (the new contributions must, "when analyzed as a whole . . . display sufficient originality so as to amount to an 'original work of authorship") (quoting 17 U.S.C. § 101). As the Second Circuit explained in *Batlin*:

> Absent a **genuine difference** between the underlying work of art and the copy of it for which protection is sought, the public interest in promoting progress in the arts . . . could hardly be served. To extend copyrightability to **minuscule variations** would simply put a **weapon for harassment** in the hands of mischievous copiers intent on appropriating and monopolizing public domain work.

536 F.2d at 492 (emphasis added; citation omitted).

[16] In *Italian Book Co. v. Rossi*, 27 F.2d 1014 (S.D.N.Y. 1928), the Court held that copying a preexisting work with mere "colorable changes" does **not** constitute an original work. *Id.* The Court described that effort – which was, at most, what Defendants say they did here – as "a clumsy effort to conceal their infringement" of preexisting work. *Id.* At best, by changing two words, Ludlow undertook a clumsy effort to conceal its own copying of the African-American spiritual and the preexisting 1948 work.

[17] In their renewal application for the 1960 copyright (Reg. No. RE386757), filed on June 27, 1988, the renewal claimants, Myles Horton, Hamilton, and Carawan, identified the renewable copyright matter as "New Words & Music Arrangement." SOF ¶ 114. The 1988 renewal copyright does not cover any part of the Song's melody.

completely new words in verses 6, 7, and 8." SOF ¶ 99.[18] Defendants have no admissible evidence to prove what the Song's purported authors added to the pre-existing work or when they did so, nor can they prove that any supposed changes were significant or non-trivial. Thus, as the party that bears the burden of proof, Defendants cannot claim the limited copyright protection for the Song as a derivative work.

### 1.    Trivial, Insignificant and Unoriginal Changes to the Song's Lyrics

Defendants rely upon two trivial differences between the work they copyrighted in 1960 and 1963 and the original African-American spiritual from which it was copied: changing the "will" to "shall" in the first two lines and in place of the contraction "we'll" in the last line of Verse 1/5 and changing "down" to "deep" in the next to last line of Verse 1/5. Every other lyric in Verse 1/5 is *identical* to the original African-American spiritual. Those two lyrical changes from the earliest known published copy of the Song, in *People's Songs* in 1948, are miniscule, trivial, and insignificant. And, of course, the words "shall" and "deep" in Ludlow's copyrighted works are *identical* to the lyrics the Jewish Young Folk-Singers sang for Hootenanny Records in 1952, that De Cormier registered in 1959, and that Seeger and Silber published in June 1960. Plainly, those miniscule, trivial, and insignificant lyrical changes – if they were changes at all – do not amount to copyrightable original work. *See WSO*, 2016 U.S. Dist. LEXIS 160965, at *13.

*First*, if the lyrics of Verse 1/5 differed from those earlier versions of the Song, the miniscule change from "will" to "shall" in Verse 1/5 is patently trivial and insignificant: the words are at most different grammatical variations of the future tense.[19] Folk music does not

---

[18] In their renewal application for the 1963 copyright (Reg. No. RE523130), filed on February 20, 1991, the renewal claimants identified the renewable copyright matter as "Arr. for voice and piano with guitar chords plus completely new words in verses 6, 7, and 8." SOF ¶ 117. The 1991 renewal copyright again does not cover any part of the melody.

[19] "The traditional rule is that shall is used with first person pronouns (*i.e.* I and we) to form the

observe such grammatical formalities; rather, folk music is filled with lyrical expressions that do not conform to grammatical rules or norms. SOF ¶ 145-46 & 154. As Dr. Harrington explains, the change from "will" to "shall" is musically insignificant. SOF ¶ 143. Nor does the change convey any different meaning in the Song, as illustrated by the change from "will" to "shall" when the Bible was modernized in the 1970s. SOF ¶ 153. No one would suggest that the Bible's meaning was changed when the text was modernized.

Even if Defendants could prove that Seeger changed "will" to "shall,"[20] the purported authors themselves regarded the change as meaningless. In 1961, for example, Seeger included the Song entitled "We **Shall** Overcome," but with the lyrics "We *will* overcome," in *Sing Out!* SOF ¶ 89 (emphasis added). Hamilton preferred singing "We *will* overcome" rather than "We shall overcome." SOF 135-37. In 1959, Carawan sang the Song as "We *will* overcome." SOF ¶¶ 37-39. There is no evidence that Horton ever sang "We *shall* overcome." SOF ¶ 35.

*Second*, the miniscule change from "down" to "deep" in the last line of Verse 1/5 is also trivial and insignificant. Both single-syllable words are commonplace in music, with "down in my heart" appearing in lyrics more than 248,000 times and "deep in my heart" appearing more than 142,000 times. SOF ¶ 159-163.[21] As Dr. Harrington notes, "both phrases are extremely

---

future tense, while will is used with second and third person forms (*i.e.* you, he, she, it, they)." *New Oxford American Dictionary* (Oxford Univ. Press, 3d ed. 2010).

[20] In 1993, after offering a tongue-in-cheek suggestion that he made the change, Seeger pointed to someone else as the true source of the change:

> No one is certain who changed "will" to "shall." It could have been me with my Harvard education. But **Septima Clarke, a Charleston schoolteacher** (who was director of education at Highlander and after the Civil Rights Movement was elected year after year to the Charleston, S.C. Board of Education) always preferred "shall."

SOF ¶ 126 (emphasis added); *see also* SOF ¶ 180. When he no longer could bear to take credit for work he knew he did **not** do, Seeger disavowed any copyright in the Song and repeatedly demanded to be removed from the copyright. SOF ¶¶ 128-134.

[21] In literature, the reverse is true, with "deep in my heart" used more often than "down in my

common and heavily used" in music and literature, and "neither phrase is original." *Id.* The use of "deep" instead of "down" did not change the Song in the least.

Common words and phrases lack originality and are not eligible for copyright protection. *WSO*, 2016 U.S. Dist. LEXIS 160965, at *13 (citing *Acuff–Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 143 (2d Cir. 1998)). In *Acuff-Rose*, the Court of Appeals affirmed summary judgment for the defendant in an infringement action, finding that the lyric "you've got to stand for something, or you'll fall for anything" was not sufficiently original to be protected by the Copyright Act. The defendant documented numerous prior uses of the same or nearly identical phrase that predated the plaintiff's copyright, "ascribing the origin of the phrase ***or of close variants*** to a variety of sources, including the Bible, Abraham Lincoln, Martin Luther King, Malcolm X, Ginger Rogers, and a chaplain of the U.S. Senate, and others that simply refer to it as an 'old saying.'" *Id.* at 143. As the Second Circuit explained in affirming this Court's decision granting summary judgment for the defendant, given the widespread popular usage of the same or nearly the same phrase, the author of the later version of the song most likely did not independently create the lyrics. The minor changes in the copyrighted work were not sufficiently original to warrant copyright protection. *Id.* at 144 ("without independent creation, the lyric lines are not protected by copyright"). *Id.*[22]

In *Bell v. Blaze Mag.*, No. 99 Civ. 12342 (RCC), 2001 U.S. Dist. LEXIS 2783 (S.D.N.Y. Mar. 15, 2001) (Casey, J.), the Court held that words and phrases "are insufficient to warrant copyright protection, as they do not exhibit the minimal creativity required for such protection."

---

heart." SOF ¶¶ 163-64.

[22] *See also Edwards v. Raymond*, 22 F. Supp. 3d 293, 298-99 (S.D.N.Y. 2014) (Cote, J.) (phrase "caught up" is not original and thus not eligible for copyright protection); 1 *Nimmer on Copyright* § 2.01[B][3] ("there is a reciprocal relationship between creativity and independent effort: the smaller the effort (*e.g.*, ***two words***) the greater must be the degree of creativity in order to claim copyright protection") (emphasis added).

*Id.* at *6 (citing *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir 1992)). In *Edwards*, the Court held that the phrase "caught up" was not copyrightable because "it is used in everyday speech in a variety of contexts." 22 F. Supp. 3d at 298-99 (Cote, J.) (citing *Acuff-Rose*, 155 F.3d at 143). The Court also held that "'I can't believe it' is a commonplace phrase ineligible for copyright protection." *Id.* at 299.[23] The common phrase "deep in my heart," which is used in everyday speech and not infused with any creativity, is not eligible for copyright protection.

Relying upon the common words "shall" and "deep" – both of which were used and published in the Song multiple times before Ludlow registered the 1960 copyright – to claim a copyright for an old African American spiritual simply because the real authors were unknown or not around to protect themselves is precisely the kind of misuse of the Copyright Act that the Second Circuit addressed in *Batlin*, improperly turning a derivative copyright into a "**weapon for harassment**." *See Batlin*, 536 F.2d at 491 (emphasis added).

The commonplace words "shall" and "deep" are used in everyday speech in many contexts. They are no more eligible for copyright protection than "you've got to stand for something, or you'll fall for anything," "caught up," or "I can't believe it." *Cf. Acuff-Rose*, 155 F.3d at 143; *Edwards*, 22 F. Supp. 3d at 298-99; *Pyatt*, 2011 U.S. Dist. LEXIS 55754 at *23.

## 2. Trivial, Insignificant and Unoriginal Changes to the Song's Melody

Defendants also claim original authorship of the Song's melody based upon three fleeting changes: (i) a change from an A-note to a G-note as a quarter-note in the first measure; (ii) the addition of a passing F-note as an eighth-note in the second and fourth measures; and (iii) the addition of a B-note as an eighth note in the seventh measure. The melody of the version of the

---

[23] In a prior action over the same song, *Pyatt v Raymond*, No. 10 Civ. 8764 (CM), 2011 U.S. Dist. LEXIS 55754, at *23 (S.D.N.Y. May 19, 2011) (McMahon, J.), the Court held that the phrase "caught up" was "not infused with the minimal creativity necessary to warrant copyright protection."

Song copyrighted in 1960 and 1963 is otherwise **_completely identical_** to the unprotected 1948 version. SOF ¶ 165. Indeed, a musicologist retained four years ago by Defendants concluded that the 1948 and 1960/1963 versions of the Song were "**_virtually the same._**" SOF ¶ 65.

As Dr. Harrington explains after analyzing the compositions and listening to at least 41 performances of the Song, the three miniscule changes – each lasting less than a tenth of a second and hardly perceptible by anyone who lacks formal musical training – are trivial and insignificant. SOF ¶ 166. The three notes are merely slight variations of performance, not compositional elements of the Song. SOF ¶¶ 167-75. Technically, the new notes are in the same diatonic chords as the notes around them, meaning they belong to the same prevailing key without any chromatic alteration. SOF ¶ 171. As Dr. Harrington explains, they are common and ordinary musical phrases and have no particular musical purpose or interest.[24] SOF ¶ 175.

Such trivial and inconsequential musical changes are not entitled to copyright protection. For example, in _Jean v. Bug Music, Inc._, No. 00 Civ. 4022 (DC), 2002 U.S. Dist. LEXIS 3176 (S.D.N.Y. Feb. 27, 2002) (Chin, J.), the Court held that a three-note sequence, consisting of C, followed by a B-flat, followed by another C, accompanied by the lyric "clap your hands" was not copyrightable because the sequence appears commonly in music. Similarly, in _James W. Newton v. Diamond_, 204 F. Supp. 2d 1244, 1253 (C.D. Cal. 2002), the district court held that a "three-note sequence (C–D-flat–C) with one background note (C) . . . cannot be protected, as it is not original as a matter of law."[25] In _Norden v. Oliver Ditson Co._, 13 F. Supp. 415, 418 (D. Mass.

---

[24] Indeed, Seeger often played the Song with the F-note and he printed the Song in "Where Have All the Flowers Gone" with an F-note in Measure 2 but not in Measure 4. SOF ¶ 127.

[25] Interestingly, Defendants' original musicologist, Dr. Ferrara, who found that the 1960/1963 version and the 1948 version of the Song were "**_virtually the same_**," testified for the defendants in that case, finding that "these three notes of music alone do not constitute an original or distinct piece of music" because "by any conventional methodological approach, these three simple notes are insignificant, and utterly insufficient to constitute original expression." SOF ¶ 65.

1936), the district court held that "occasional changes in the length of certain notes" would not qualify for copyright protection, because the song "remained 'the same old tune.'" *See also Poindexter v. EMI Record Group, Inc.*, No. 11 Civ. 559 (LTS)(JLC), 2012 U.S. Dist. LEXIS 42174, at *11-12 (S.D.N.Y. Mar. 27, 2012) (Swain, J.) (musical note is not copyrightable).

The fleeting and common melodic changes on which Defendants base their copyright claim – a quarter-note in the first measure, a passing eighth-note in the second and (identical) fourth measures, and an eight-note in the seventh measure – each lasting a mere fraction of a second, exceedingly common, and of no musical significance – are no more entitled to copyright protection than the simple three-note sequences in *Bug Music* and *Diamond* or the occasional melodic changes in *Norden*.

### 3.    Divesting Publications of the Verse 1/5 Lyrics and Melody

Finally, even if the miniscule changes to the lyrics were copyrightable, publication of ***the identical lyrics*** without a copyright notice[26] in *Sing Out!* in June 1960, four months ***before*** Ludlow registered the Song, irrevocably put the lyrics in the public domain. The Copyright Act requires published copies of a protected work to include a notice of copyright. *Sunset Lamp Corp. v. Alsy Corp.*, 698 F. Supp. 1146, 1151 (S.D.N.Y. 1988) (Mukasey, J.). For works published prior to 1989, if a work was published before a copyright was registered, the work was dedicated to the public and any copyright was invalidated. *Universal Film Mfg. Co. v. Copperman*, 212 F. 301, 303 (S.D.N.Y. 1914). *See also Gardenia Flowers, Inc. v. Joseph Markovits, Inc.*, 280 F. Supp. 776, 783 (S.D.N.Y. 1968) ("[p]ublication without such notice amounts to a dedication to

---

[26] Seeger was Associate Editor of *Sing Out!* As the purported author of the changed lyrics, he had authority to publish them in *Sing Out! See Papa's-June Music, Inc. v McLean*, 921 F.Supp. 1154, 1158 S.D.N.Y. 1996) (Cedarbaum, J.) (joint author has "independent right to use" work in question, including right to publish) (citing *Community for Creative Non-Violence v. Reid,* 846 F.2d 1485, 1498 (D.C. Cir. 1988), *aff'd,* 490 U.S. 730 (1989)).

the public sufficient to defeat all subsequent efforts at copyright protection"); *Cordon Holding B.V. v. Northwest Publ'g. Corp.*, Mo. 98 Civ. 4797 (AGS), 2002 U.S. Dist. LEXIS 6111, at *16 (S.D.N.Y. Apr. 8, 2002) (Schwartz, J.) (notice required for all works created before 1989).

In *Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756, 761 (2d Cir. 1995), on eerily similar facts – both cases involved old songs taught to Seeger, which he published in *Sing Out!* without a copyright notice[27] – the Second Circuit held that Seeger's publication of lyrics in 1956 and 1964 without the statutory notice "placed . . . [the] verse in the public domain." *Id.* at 761-62. Just as in *Sanga Music*, Seeger's publication of the identical Verse 1/5 lyrics in *Sing Out!* in June 1960, four months **before** Ludlow registered its first copyright for the Song, irrevocably placed those lyrics in the public domain.

Seeger's publication in the April-May 1961 edition of *Sing Out!* of the melody and lyrics of Verse 1/5 likewise ended whatever limited copyright Ludlow may have obtained in 1960. If a copyrighted work is later published without the required notice, the copyright is invalidated. *Sunset Lamp*, 698 F. Supp. at 1151-52 (sale of lamps without statutory notice after copyright registered invalidates copyright); *W. Publ'g. Co. v. Edward Thompson Co.*, 169 F. 833, 877 (C.C.D.N.Y. 1909) (copyright is lost when no notice of original work is printed with later use of article); *Nat'l Comics Publs., Inc. v Fawcett Publs., Inc.*, 191 F2d 594, 600-01 (2d Cir. 1951) (after copyright secured, later publication without notice forfeits copyright). Seeger's 1961

---

[27] In *Sanga Music*, a songwriter named Doris Plenn ("Plenn") learned a traditional two-verse folk hymn called "How Can I Keep From Singing" from her grandmother. *Id.* at 758. She added a third verse of her own in the early 1950s. *Id.* In 1956, Plenn taught the song to Seeger, who published the song, including the third verse, in *Sing Out!* in 1956 without a copyright notice for the song. *Id.* In an introductory note, Seeger said he learned the song from Plenn, who learned it from her grandmother, and "suggested that it was probably over 100 years old." *Id.* In 1964, Seeger again published the song without any copyright notice protecting her work.

publication ended any copyright to melody and the lyrics of Verse 1/5.[28]

### C.   Both Copyrights Are Invalidated By Ludlow's Fraud on the Copyright Office

Plaintiffs also seek to invalidate both copyrights for fraud on the Copyright Office. The party claiming fraud on the Copyright Office must show that: (i) the registration application is factually inaccurate; (ii) the inaccuracies were deliberate; and (iii) the Copyright Office relied on those misrepresentations. *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126 (RWS), 2000 U.S. Dist. LEXIS 10394, at *42-43 (S.D.N.Y. July 25, 2000) (Sweet, J.) (citations omitted). The "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid and thus incapable of supporting an infringement action . . . or denying enforcement on the ground of unclean hands." *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984).[29]

*First*, Ludlow's 1960 and 1963 applications were factually inaccurate. The 1960 and 1963 applications misidentified the real authors of the Song, who were the unnamed African-

---

[28] Seeger had no songwriter's agreement for the Song with Ludlow when he published the melody and Verse 1/5 lyrics in *Sing Out!* in 1961. SOF ¶ 52 & 98.

[29] Howard Richmond, President of Ludlow when it registered the copyrights in 1960 and 1963, had a history of committing copyright fraud. In *Mills Music, Inc. v. Cromwell Music, Inc.*, 126 F. Supp. 54 (S.D.N.Y. 1954), the Court found that Richmond fraudulently obtained a copyright to the song "Tzena Tzena" when he was general manager of an affiliated company called Cromwell Music:

> Its own claim to the copyright of "Tzena" was conceived in fraud and was presented to the music publishing and recording world in the double fraud of concealing the name of the real composer of "Tzena" and ***asserting a claim of authorship in the name of a fictitious person, Spencer Ross, under which the corporation's general manager, Howard Richmond, was masquerading***.

> Before the defendant published its edition of "Tzena", ***Richmond knew who its true author was***.

*Id.* at 71-72 (emphasis added).

American women who wrote the original spiritual many years earlier. Even if Seeger had written a couple of words in Verse 1/5 (and if those words were copyrightable), his name was not on the 1960 application. To conceal the Song's origin – and its similarity to the original spiritual – the 1960 application falsely referred to "I'LL OVERCOME," although no registered work with that title existed and the Song was completely different from Tindley's song, "I'll Overcome Some Day."[30] Moreover, Ludlow falsely claimed that Verses 6 and 7 were wholly original works. That was patently false, as those verses were written by others. SOF ¶¶103-06 & 138.

*Second*, the inaccuracies were deliberate. Before Ludlow registered the Song in 1960, it had been published in Seeger's magazine in 1948. Ludlow had no basis to claim it was derived from "I'll Overcome Some Day," as it had not even *seen* that song before registering the copyright. Ludlow also had no basis on which to refer to "I'LL OVERCOME" as a previously registered work because no such work with that title had ever been registered. Apparently, when Seeger showed "I'll Overcome Some Day" to Ludlow in 1963, Brackman (Ludlow's General Manager) immediately recognized that *We Shall Overcome* was *not* derived from Tindley's song because the melody and lyrics of the two works were "completely different."

*Third*, the Copyright Office obviously considered the Song's provenance important. When Ludlow first sought to register the copyright in August 1960, the Copyright Office withheld approval and sought clarification of what new work was added by the three "authors" named in the application. SOF ¶ 60. Instead of clarifying the matter for the Copyright Office by

---

[30] In *Gibson Tex, Inc. v. Sears Roebuck & Co.*, 11 F. Supp. 2d 439, 442 (S.D.N.Y. 1998) (Leisure, J.), the Court held that "the failure to alert the Copyright Office to relationships between the work for which registration is sought and prior works of others endangers the presumption of validity." *See also Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980) (Haight, J.) (when registrant fails to identify prior work in the public domain, Copyright Office is denied opportunity to pass on originality). That is exactly what happened: by misstating the identity of the prior work, Ludlow deprived the Copyright Office of the opportunity to determine the lack of originality in the derivative work.

24

identifying the African American spiritual, by identifying the actual sources of Verses 1/5, by specifying what work each of the three purported authors supposedly contributed, or by adding Seeger as a purported author, Ludlow continued to obfuscate the Song's origin and what little new work (if any) was added by the three named "authors." Assured by Ludlow that the three "authors" were responsible for the Song, the Copyright Office granted the application two months later. SOF ¶ 61. Ludlow continued to withhold that information (except for the addition of Seeger's name) from the Copyright Office in its 1963 copyright application, and also misrepresented the origin of Verses 6 and 7. SOF ¶¶ 53 & 61.

Since Plaintiffs have met their burden to show Ludlow's fraud on the Copyright Office in 1960 and 1963, the Court should invalidate both copyrights in their entirety.

## IV.   **CONCLUSION**

For all these foregoing reasons, the Court should grant Plaintiffs' motion and enter partial summary judgment in their favor, holding that Defendants do not own a copyright to the melody or lyrics of Verse 1/5 of *We Shall Overcome* and declaring that the Song is in the public domain.

Dated:  June 20, 2017                    Respectfully submitted,

                                         WOLF HALDENSTEIN ADLER
                                         FREEMAN & HERZ LLP

                              By:      /s/  Randall S. Newman
                                       Mark C. Rifkin
                                       rifkin@whafh.com
                                       Randall S. Newman
                                       newman@whafh.com
                                       Gloria K. Melwani
                                       melwani@whafh.com
                                       270 Madison Ave.
                                       10th Floor
                                       New York, NY 10016
                                       (212) 545-4600

                                       *Attorneys for Plaintiffs and the Class*