UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
WE SHALL OVERCOME FOUNDATION and      :        16cv2725(DLC)
BUTLER FILMS, LLC, on behalf of       :
themselves and all others similarly   :        OPINION AND ORDER
situated,                             :
                                      :
                    Plaintiffs,       :
                                      :
          -v-                         :
                                      :
THE RICHMOND ORGANIZATION, INC. (TRO  :
INC.) and LUDLOW MUSIC, INC.,         :
                                      :
                    Defendants.       :
                                      :
------------------------------------- X

APPEARANCES:

For the Plaintiffs:
Mark C. Rifkin
Randall S. Newman
Gloria K. Melwani
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Ave, 10th Floor
New York, NY 10016

For the Defendants:
Paul LiCalsi
Ofer Reger
Robins Kaplan LLC
601 Lexington Ave, Suite 3400
New York, NY 10022

DENISE COTE, District Judge:

        The defendants The Richmond Organization, Inc. ("TRO") and

its subsidiary and imprint Ludlow Music, Inc. ("Ludlow")

(collectively, the "Defendants") possess two copyrights in the

musical composition "We Shall Overcome" (the "Song" or the

"Copyrighted Song"), registered as a derivative work with the Copyright Office in 1960 and 1963.  In this litigation, the plaintiffs We Shall Overcome Foundation ("WSOF") and Butler Films, LLC ("Butler") (collectively, the "Plaintiffs") challenge through a putative class action the validity of the Defendants' copyrights in the Song.

The Plaintiffs have filed a motion for partial summary judgment in which they principally argue that the lyrics and melody in the first verse and its identical fifth verse ("Verse 1/5") of the Song are not sufficiently original to qualify for copyright registration as a derivative work.[1]  For the reasons that follow, that portion of the Plaintiffs' motion for summary judgment is granted.

### BACKGROUND

The following describes the evidence which is either undisputed or taken in the light most favorable to the Defendants, unless otherwise noted.

### Origins of the Song

The exact origins of the Song are unknown.  The parties offer several examples of works that might be precursors to the

---

[1] While the motion purports to be for partial summary judgment, the plaintiffs seek as well to invalidate the copyrights as a whole based upon fraud on the Copyright Office.

Song, including "O Sanctissima," an 18th century hymn in the public domain; "I'll Overcome Someday," a hymn by Charles Albert Tindley registered with the Copyright Office in 1900; "I'll Be Alright," a song that "came out of the Negro Church"; and "If My Jesus Wills," a song by Louise Shropshire registered with the Copyright Office in 1954.

In the 1940s, a version of the Song called "We Will Overcome" was used as a protest song by striking tobacco workers, mostly African-American women, in Charleston, South Carolina.  In the early 1940s, Zilphia Horton ("Horton"), an educator and musician working at the Highlander Folk School, learned "We Will Overcome" from striking workers when they visited the school.[2]  Horton later taught a version of the Song to Pete Seeger ("Seeger"), the renowned American folk singer.

In 1946, Horton began work on a songbook of mostly union songs for the chorus of the Congress of Industrial Organizations ("CIO"), a federation of unions that organized workers in industry.  A version of the Song (the "Folk School Version") was included in a Highlander Folk School songbook titled <u>Sing Out Brother</u> sometime in 1948.  The songbook was not copyrighted, nor

---

[2] The Highlander Folk School is located in Tennessee and in the 1940s and 1950s was an adult educational center that trained labor organizers.

is there evidence in the record as to its distribution.  The songbook attributed the melody to an unnamed "Old Negro spiritual" and the words to "Highlander students FTA term '46."

The Folk School Version is as follows:



## PSI Version:  Public Domain Version

In September 1948, People's Songs, Inc. ("PSI") published "We Will Overcome" in Vol. 3, No. 8 of People's Songs magazine (the "PSI Version").  The Plaintiffs' argument that Verse 1/5 of the Song is in the public domain rests largely on a comparison of the PSI Version and the Copyrighted Song.

The second page of the September 1948 People's Songs

4

edition lists Seeger as Chairman and as a member of the Board of Directors of PSI.  It also contains the copyright notice: "Copyright 1948 by People's Songs, Inc."  The Catalog of Copyright Entries for January-June 1949 lists the September 1948 edition of People's Songs as registered on September 7, 1948 under Reg. No. B184728.  The copyright expired in 1976.  It is undisputed that the copyright for the September 1948 edition of People's Songs was never renewed and that the PSI Version of the Song is now in the public domain.

The magazine's byline states:  "By FTA-CIO Workers Highlander Students."  The Song's introduction is accompanied by a picture of Horton and explains that the Song "was learned by Zilphia Horton of the Highlander Folk School, in Tennessee, from members of the CIO Food and Tobacco Workers Union. . . . It was first sung in Charleston, S.C., and one of the stanzas of the original hymn was 'we will overcome.'"

The PSI Version appears in People's Songs as follows:



## 281  We Will Overcome

By FTA-CIO Workers
Highlander Students

This simple and moving hymn tune becomes especially thrilling when you consider where the song was first sung. It was learned by Zilphia Horton of the Highlander Folk School, in Tennessee, from members of the CIO Food and Tobacco Workers Union. Many a visitor to the south has never forgotten hearing the rich harmonies of some little band, and the determination in these words, even though surrounded on all sides by hate, Jim Crow and all the forces of power and money.

Zilphia writes: "It was first sung in Charleston, S.C., and...one of the stanzas of the original hymn was..."we will overcome"...At school here they naturally added other verses...Its strong emotional appeal and simple dignity never fails to hit people. It sort of stops them cold silent."





The Lord will see us through,
The Lord will see us through,
The Lord will see us through, some day,
(CHORUS:)

We're on to victory . . .
(CHORUS:)
We will overcome . . .
(CHORUS:)

The melody of the Folk School Version and the PSI Version are identical, although the PSI Version adds lettered chords above the musical staff.  The lyrics of the only verse in the Folk School Version, and the first and last verse of the PSI Version are identical, and read:

     We will overcome
     We will overcome
     We will overcome some day
     Oh down in my heart, I do believe
     We'll overcome some day

6

**Other Pre-Copyright Versions**

There were three more releases of versions of the Song before the Song was copyrighted in 1960 in which the lyrics were identical or nearly identical to the Song's Verse 1/5:  the Hootenanny Version in 1952, the Cherry Lane Version in 1959, and the Sing Out Lyrics in 1960.  Each release uses "shall" instead of "will" and "deep" instead of "down," although the first two use the contraction "we'll" in the thirteenth measure, rather than "we shall."  The Plaintiffs assert that all three demonstrate the Song's lack of requisite originality, and that the publication of the Sing Out Lyrics also divested the Defendants of their copyright in the Song.

In 1952, Hootenanny Records released a phonograph record with a recording of the Jewish Young Folk Singers' performance of "We Shall Overcome" as directed by Robert De Cormier (the "Hootenanny Version").  This is the earliest version of the Song in the record in which "shall" replaces "will" and "deep" replaces "down."

In 1959, Vanguard Records released a phonograph record titled "Out of Egypt: The Story of Moses," which included a performance of "We Shall Overcome" by the Robert De Cormier Chorale.  In connection with that release, in November or December 1959, Cherry Lane Music, Inc. filed an application for

7

copyright registration for "MUSIC FOR THE 1st FIVE (5) BOOKS OF MOSES." The copyright application identified "Robert De Cormier (Bob Corman-pseudonym)" as author of "ARRANGEMENT & ADAPTATION OF WORDS AND MUSIC" and lists the new matter in the version as follows: "THIS MUSIC IS AN ARRANGEMENT AND ADAPTATION OF VARIOUS NEGRO SPIRITUALS, TO BE USED IN CONJUNCTION WITH THE 1st FIVE BOOKS OF MOSES, FROM THE HOLY BIBLE." The deposit copy of the registered work includes sheet music for a version of the Song titled "We Shall Overcome" "Arr. by Bob Corman" (the "Cherry Lane Version").[3]

The deposit copy appears as follows:

---

[3] The Defendants submit a declaration from Robert De Cormier, director of the Hootenanny Version and the arranger and adapter of the Cherry Lane Version, stating "that he did not ask any of the authors of We Shall Overcome for permission to arrange and release a recording of the song, nor does he claim any authorship in the words or melody of We Shall Overcome." He asserts that he "believed [the Song] to be an old negro spiritual" but learned around 1959 through conversations with Seeger that Seeger "made changes from preexisting material which became the song We Shall Overcome."



In June 1960, Seeger's magazine <u>Sing Out! The Folk Song Magazine</u> published lyrics identical to those in the Song's Verse 1/5 without music (the "Sing Out Lyrics").  Sing Out, Inc. registered the copyright for the volume as a collective work with the Copyright Office on June 1, 1960.  There was no separate registration or copyright notice for the lyrics.  The lyrics were printed as:

> We shall overcome,
> We shall overcome,
> We shall overcome some day;
> Oh, deep in my heart,
> I do believe,
> We shall overcome some day.

**The Process of Copyrighting the Song in 1960 and 1963**

Ludlow entered into a Popular Songwriter's Contract dated

July 6, 1960 with Zilphia Horton,[4] Frank Hamilton ("Hamilton"),

and Guy Carawan ("Carawan") for the Song.  On August 30, 1960,

Al Brackman ("Brackman"), who was the General Manager of TRO

from 1960 through the 1980s, wrote to Carawan and Hamilton at

the Highlander Folk School: "The U.S. Copyright Office has

requested that on the certificate for copyright registration in

regard to WE SHALL OVERCOME, we specify what 'new matter' our

version includes.  Would you please rush to me your information

on this so that we can specify the information accurately."

Brackman instructed that the new matter could include any

alteration to the melody line or lyrics.

The response, handwritten on a lead sheet produced from

Ludlow's files and date-stamped October 25, 1960, states in

full:

> 1) The original spiritual was I'll Overcome[.]
> Zilphia changed it to We'll Overcome 2) The melody is
> slightly changed 3) The harmonization is original 4)
> Verses 2, 3, & 4 are new

On October 27, 1960, Songways Services, Inc. ("Songways"),[5]

on behalf of Ludlow, filed an Application for Registration of a

---

[4] Horton died in 1956.  Her husband and executor of her estate,
Myles Horton, entered into the songwriter's contract with Ludlow
on her behalf.

[5] Ludlow has no employees and is managed by Songways Service,
Inc.

Claim to Copyright for a derivative musical composition titled "We Shall Overcome."  The owner of the copyright is listed as "Ludlow Music, Inc."  The application for registration listed Zilphia Horton, deceased, Frank Hamilton, and Guy Carawan as authors of "New words & music Arrangement."

Question 5(a) asked that "[i]f a claim to copyright in any substantial part of this work was previously registered in unpublished form, or if a substantial part of the work was previously published, check one or both of the boxes: Previous registration or Previous publication."  Only the "Previous registration" box was checked.

If one of the 5(a) boxes has been checked, Question 5(b) asks that the applicant "give a brief, general statement of the nature of any substantial matter in this new version.  New matter may consist of musical arrangement, compilation, editorial revision, and the like, as well as additional words and music."  Songways, on behalf of Ludlow, wrote in response: "Original registration under title I'LL OVERCOME.  Melody has been changed.  Harmonization wholly original.  Verses 2, 3, 4 of lead sheet attached all original."  The copyright was registered as No. EU645288.[6]

---

[6] A renewal application was filed on June 27, 1988.

The deposit copy includes five verses.  The first and fifth verses both read:

    We shall overcome,
    We shall overcome
    We shall overcome some day
    Oh deep in my heart I do believe
    We shall overcome some day.

The sheet music covering Verse 1/5 of the deposit copy appears as follows:



In the summer of 1963, as TRO prepared to file a second application to register the Song with the Copyright Office, TRO received information from Seeger and his wife Toshi Seeger, including a letter sent to "Pete" from Waldemar Hille ("Hille"), the editor of Sing Out! The Folk Song Magazine.  Hille's letter

explained that he had discovered the "undoubted religious original" of the Song in an "AME Church" in Louisiana.  The "tune was basically the same."  The hymn was called "I'll Overcome" or "I'll Be Alright."[7]

Another item sent to TRO was an audiotape that Seeger made in July 1963 (the "1963 Tape").[8]  In the 1963 Tape, Seeger discusses the Song's origins.  Seeger states that "Zilphia [Horton] taught me the song in 1946, as I remember, when she came to New York City."  As described in more detail below, Seeger demonstrates and discusses the various ways in which he, Horton, Carawan, Hamilton, and various communities in the South sing the Song and the contributions each of them made to the Song.  He describes the Song as "really and truly one of the world's greatest songs" and expresses pride in "helping to get

---

[7] Carawan and his wife, Candie Carawan, published sheet music for "I'll Be Alright" in their book Freedom is a Constant Struggle in 1968.  The introduction to "I'll Be Alright" states that "[t]he anthem of the Civil Rights Movement, 'We Shall Overcome,' was originally 'I'll Be Alright,' and came out of the Negro Church."

[8] The tape is offered with a declaration that states: "Attached hereto as Exhibit 7 is a true and correct digital audio file copy of an analog tape recording made by Pete Seeger in July 1963 about the song 'We Shall Overcome.'  The recording was made from a quarter-inch analog magnetic tape that was found in Defendants' files in a reel box labeled 'Pete Seeger Comments "We Shall Overcome" Rec'd 7/10/63.'  The analog tape was obtained from the Defendants' business records."

[the Song] around."  "He also expressed regret that the original authors are not credited:

> [I]t's only a pity that . . . it's impossible to find the exact people that Zilphia Horton learnt the song from.  They're the biggest single missing link in the chain. . . .  Somewhere today, probably in North Carolina or South Carolina, are some poor Negroes who taught the song to Zilphia.  If it were possible to locate them, it would be wonderful, but frankly I don't know how to do it.  But I know that if anybody asks me who deserves credit for the song, I feel like wanting to mention them, even though we don't know their name.

Seeger describes the Song as "right in the mainstream of the folk process, and it's swirling along right now.  And no two cities in the South probably sing it exactly alike."  He suggests that, in order to forestall an "awful lot of arguments" from alleged authors of various verses, the Song be credited as follows:  "New words and music arrangement by Zilphia Horton, Frank Hamilton, Guy Carawan, and Peter Seeger and others.  All royalties contributed to the Freedom Movement of the South."

After listening to the 1963 Tape, reviewing the Hille letter, and speaking with Carawan, Brackman advised Howard S. Richmond, the founder and president of TRO, that "Seeger will correct the lead sheet to include certain melodic additions that have become part of the song through usage in various areas, and

will add two verses that do not appear on our lead sheet now."[9]

Brackman observed that:

> Zilphia originated the melody.  The fact that Sing Out
> and others say she heard it first sung by FTA Union
> Workers does not necessarily mean that it is the same
> song, and since no one knows what it is that the Union
> workers sang, any similarity of Zilphia Horton's song
> with the Union worker's song would be conjecture.  The
> reference to the Tindley hymn . . . could be
> coincidence.  The melody of the Tindley hymn is
> different from Horton's:  The words of the hymn are
> different from Horton's basic words, and the format of
> the two songs is different.

> In talking to Pete, after hearing his tape, he asked
> "What would happen if someone at some time in the
> future claimed to have written the song, or any part
> of the words or music?"  I pointed out to Pete that if
> this is a possibility, it would also be possible for
> one or more people to claim the song.  They would have
> to prove origination.  But as far as we know -- or
> anyone knows -- Zilphia Horton is the only known
> person to have first sung the song as it is now being
> sung, and taught it to dozens and dozens o[f] people -
> - and any variation of her music line or basic words
> would be an interpretation or arrangement of her
> copyright.

On October 8, 1963, Songways, on behalf of Ludlow, filed

another Application for Registration for the derivative work "We

Shall Overcome."  The owner of the copyright is again listed as

---

[9] The 1963 deposit copy shows that two new verses were added, as
was a piano accompaniment and slightly different guitar chords.
No "melodic additions" were made.  In the 1963 Tape, Seeger
suggests adding certain melodic "changes that are being made by
the singers in the South today" to the Copyrighted Song, but
these were not added.

"Ludlow Music, Inc."  The application identifies Horton, Hamilton, Carawan, and Seeger as the authors of "New words and music adaption."  The 1963 Application again checks the "Previous registration" box in 5(a) and in 5(b) identifies the "new matter in this version" as "Arr. for voice and piano with guitar chords plus completely new words in verses 6, 7, and 8. The addition of Pete Seeger's name to writer credits is new." The copyright was registered as No. EP179877.[10]  The sheet music for Verse 1/5 of the 1963 deposit copy appears as follows:

---

[10] A renewal application was filed on February 20, 1991.



With one exception, the lyrics and melody of Verse 1/5 are identical in the 1960 and 1963 deposit copies.[11]  The 1963 deposit copy adds a tempo notation: "Moderately slow with determination ($\downarrow$ = 66)."[12]  The guitar chords listed above the staff in the 1963 deposit copy are slightly more elaborate, and as noted in the application, it adds a piano arrangement.

In his 1993 book, Where Have All the Flowers Gone, Seeger explained the reason for seeking a copyright: "In the early '60s our publishers said to us 'If you don't copyright this now, some Hollywood types will have a version out next year like "Come on Baby, We Shall overcome tonight.'  So, Guy [Carawan], Frank [Hamilton], and I signed a 'songwriter's contract.'"

In 1994, Seeger requested that Ludlow remove his name from the copyright for "We Shall Overcome," writing that "I clean forgot to ask you yesterday to remove my name legally from 'We Shall Overcome.'  Guy + Frank have a clear authority to be the 'arrangers' and 'adapters' of that.  My name is no longer necessary, I believe, to help protect it."  Howard Richmond sent

---

[11] The only difference is that the final note in Verse 1/5 is held two beats longer in the 1963 deposit copy.  In this litigation, the parties do not attribute any significance to this single change.

[12] The only prior version with a suggested tempo is the Cherry Lane Version, which indicated: "SLOW".

a June 29, 1994 inter-office communication to his son Larry
Richmond, who is now the president of TRO, regarding Seeger's
request: "Perhaps we should review what actual steps are
involved to remove his name from a copyright credit, and reflect
on the impact it would have before proceeding.  We could tell
Pete we're investigating it in hopes he may forget."  Despite
further discussions on the matter, Seeger's name was never
removed from the copyright registrations.

**Post-Copyright Divestment Version**

The Plaintiffs contend that the Defendants dedicated the
Song to the public again after the 1960 copyright registration
of the Song.  The April-May 1961 edition of the Sing Out! The
Folk Song Magazine published sheet music with lyrics for five
verses of the musical composition of "We Shall Overcome" (the
"Sing Out Version").  The song is titled "We Shall Overcome,"
although the printed lyrics read "We will overcome."  The
introduction to the song explains that it "is an adaptation of
an old hymn" introduced by "members of the CIO Food and Tobacco
Workers Union" to the Highlander Folk School.  Seeger is listed
as an Associate Editor of the magazine.

The Sing Out Version appears as follows:

# We Shall Overcome



This song, which has become almost an unofficial theme song of the integration movement in the South, is an adaptation of an old hymn. A number of years ago, members of the CIO Food and Tobacco Workers Union introduced the song at the Highlander Folk School in Monteagle, Tennessee. At the height of the successful Montgomery (Alabama) bus boycott led by Rev. Martin Luther King, a few years back, it was sung by Negroes in the face of a hostile mob — and television cameras caught the simple, moving dignity of the song and the people who sang it for the entire nation to see and hear.

The Sing Out Version contains the same lyrics as the PSI Version except that it uses "deep" rather than "down."

**Differences Between the PSI Version and the Copyrighted Song**

There are four differences between the PSI Version and the Copyrighted Song that the Defendants contend make the Copyrighted Song a derivative work entitled to copyright protection.  Two are differences in the lyrics in Verse 1/5, and

20

two are differences in the melody/rhythm.

The first difference in the lyrics between the PSI Version and the Song is between "will" and "shall."  This appears in the first and third measures, and also in the related difference between "we'll" and "we shall" in the thirteenth measure.  The second difference is between "down" and "deep" in measure nine.

A comparison of the music of the 1948 PSI Version and the 1960 Copyrighted Song,[13] depicted below, illustrates the two differences in their melodies and rhythm.[14]  The measures are numbered and differences between the two versions are indicated with a mark located below the staff.

---

[13] As noted above, the melody of the Song is identical in the 1960 and 1963 copyrighted versions except that the final note in measure sixteen is held for two beats longer in the 1963 version.

[14] A reference to melody in the discussion that follows should be understood generally as including a reference as well to rhythm.



The first difference appears in measures one and two.  That same difference is repeated in measures three and four.  In both versions of the Song the differences occur during the melodic descent from note "A" to "E" during the singing of the word "overcome."  Specifically, the descent from "A" to "E" begins one beat later in the Copyrighted Song, and an eighth note "F" is added between notes "G" and "E" in the second measure.  This also changes the rhythm of the second measure.

The second difference appears in the seventh measure.  In both versions, the melodic descent is from note "D" to "G" during the singing of the word "someday," which is sung over measures six to eight.  The Copyrighted Song adds a flourish or

trill during this descent, while the word "day" is being sung. The trill consists of three eighth notes "A – B - A."[15]

An expert for the Defendants recently concluded that the Copyrighted Song is virtually identical to the PSI Version.  In the early years of this century, the heirs of Louise Shropshire threatened the Defendants with a copyright suit, claiming that "We Shall Overcome" was derived from Shropshire's "If My Jesus Wills."  In response, the Defendants retained an expert musicologist, Lawrence Ferrara, Ph.D. ("Ferrara"), a professor of music at New York University.  In his May 14, 2013 report (the "Ferrara Report"), Ferrara opines on whether the Song was copied from "If My Jesus Wills" and on the musical and lyrical origins of the Song.  In his detailed analysis he explains why the Song was not copied from "If My Jesus Wills," and also opines that the Song and its PSI Version are "virtually the same."  In its letter to the heirs enclosing the Ferrara Report, the Defendants' attorneys explain that the PSI Version of the

---

[15] There is a third difference between the PSI Version and the 1960 Song.  It appears in the thirteenth measure.  The Defendants do not suggest in their brief in opposition to this motion that this difference has significance for whether the Song is entitled to protection.  Moreover, they have offered no evidence of the authorship of this variation.

Song "is the precursor" of the Song, and not Shropshire's "If My Jesus Wills."

**Seeger's Statements Regarding Authorship**

The parties contest whether there is evidence that the four authors listed on the 1963 Application for Registration created the four differences in the Song identified above.  In addition to the copyright registration itself, the Defendants rely on statements made over the course of four decades by Seeger regarding the origins of these elements.  Seeger's statements appear in the 1963 Tape and two more recent books.

Seeger's statements on the 1963 Tape are equivocal regarding authorship of the two word differences.  He states

> [S]omewhere along the line, I seem to have made it "we shall overcome," instead of "we will overcome."  And also, I remember being confused by singing "deep in my heart" and being surprised when people say no, it's supposed to be "down in my heart," and realizing that, evidently I was singing it differently than it was supposed to be.  So my guess is probably my sole contribution, great contribution, has been to have -- changed the word "down" to "deep," and "will" to "shall" outside of a couple of verses which I've added, such as "We will walk hand in hand," and "the whole wide world around," which I don't believe hardly anybody but me sings.[16]

Seeger also describes, and demonstrates by singing, various

---

[16] A document Toshi Seeger sent to Brackman in 1963, around the time the 1963 Tape was made, attributes the line "We Shall Overcome" to "Pete Seeger."

ways in which "We Shall Overcome" was being sung.  With regard
to the two melody differences described above, Seeger relates
the following.

Seeger sings variations of the first and second measure --
including the word "overcome" -- in three styles.  First, he
sings it in Horton's style [which appears to be the PSI
Version], but notes that he felt "that was just too quick."  He
then sings it again in the way he preferred to sing the Song
[which appears similar to the Cherry Lane and Sing Out
Versions].  Next, he sings it in the style of Carawan and
Hamilton, noting that "Guy [Carawan] has made it even more
regular . . . and this is the way the Negroes in the South sing
it today."  [This appears to be the same as the Copyrighted
Song.]  Seeger notes that he still doesn't sing it in the
Carawan style, with that "extra little note, which is an 'F'".

Seeger also describes and sings through the seventh measure
-- the melody sung during the word "day."  He demonstrates
Horton's way of singing "day" with a "trill or little quaver."
Seeger states that he took this "nice melodic thing" and made it
"a little bit more regular, because audiences couldn't get it"
by singing it as "a triplet on the last note of the measure."
[This appears to be the triplet melody in the Cherry Lane and
Sing Out Versions for the word "day."]  He notes that "Guy

25

[Carawan] and Frank [Hamilton] make it even more regular" by turning it into "three big eighth notes" and "this is the way it is done by Negroes in the South today."  [This appears to be the same as the Copyrighted Song.]

In Seeger's demonstrations, it appears that the musical style preferred by Carawan and Hamilton is the style most closely embodied by the Copyrighted Song.  Seeger emphasizes that he prefers to sing a different version.

Roughly twenty years after the copyrights were issued, in the 1982 book by David K. Dunaway, How Can I Keep From Singing, Seeger is quoted as saying "I changed it to 'We shall.'  Toshi [Seeger] kids me that it was my Harvard grammar, but I think I liked a more open sound; 'We will' has alliteration to it, but 'We shall' opens the mouth wider; the 'i' in 'will' is not an easy vowel to sing well."

Thirty years after the copyrights were issued, in his 1993 book Where Have All the Flowers Gone, Seeger wrote: "No one is certain who changed 'will' to 'shall.'  It could have been me with my Harvard education.  But Septima Clarke, a Charleston schoolteacher (who was director of education at Highlander) always preferred 'shall.'  It sings better."[17]

---

[17] Clarke is not a listed author of the Song on its copyright registration.

Not all of those listed as authors on the Applications for Registration preferred the use of the word "shall" to "will." In a 2015 interview, Hamilton stated: "I like to sing we <u>will</u> overcome because will is a stronger word than shall. . . . [A]s a matter of fact when I sing the song publicly, I always sing 'we <u>will</u> overcome <u>today</u>,' rather than 'someday.'" (emphasis supplied).

### The Present Dispute

In 2013, defendant Butler produced "The Butler," an award-winning American historical drama, for which it sought to use "We Shall Overcome" in several scenes.  Butler ultimately paid $15,000 for a license to use the Song for no more than ten seconds.

In February 2015, WSOF requested a quote from the Defendants for a synchronization license to use "We Shall Overcome" in a documentary movie.  WSOF sent an <u>a cappella</u> version of the first verse to the Defendants in March.  The Defendants refused to grant WSOF a synchronization license to use the Song.  WSOF paid the Defendants $45.50 for a mechanical license to produce and distribute 500 copies of the Song as a digital phonorecord.

The Plaintiffs filed this complaint against TRO and Ludlow on April 14, 2016, seeking a declaratory judgment that, <u>inter</u>

27

alia, the Defendants' copyright registrations do not cover the melody or "familiar lyrics" to the Song.  The Defendants' motion to dismiss was granted in part as to various state law claims on November 1, 2016.  We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.), 221 F. Supp. 3d 396, 409-413 (S.D.N.Y. 2016).

On June 20, 2017, the Plaintiffs filed this motion for partial summary judgment.  With their August 18 reply brief, the Plaintiffs filed a motion pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), seeking exclusion of the Defendants' two expert reports.  The Daubert motion became fully submitted on August 30 and is addressed below.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co.

v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink
v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015).  If the
moving party makes this initial showing, the burden then shifts
to the opposing party to establish a genuine dispute of material
fact.  El-Nahal v. Yassky, 835 F.3d 248, 252, 256 (2d Cir.
2016).

    Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, "the party opposing
summary judgment may not merely rest on the allegations or
denials of his pleading; rather his response, by affidavits or
otherwise as provided in [Rule 56], must set forth specific
facts demonstrating that there is a genuine issue for trial."
Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation
omitted).  "[C]onclusory statements, conjecture, and
inadmissible evidence are insufficient to defeat summary
judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317
(2d Cir. 2011) (citation omitted), as is "mere speculation or
conjecture as to the true nature of the facts."  Hicks v.
Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).
"An issue of fact is genuine and material if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  Cross Commerce Media, Inc. v. Collective,
Inc., 841 F.3d 155, 162 (2d Cir. 2016).  The court must draw all

inferences and all ambiguities in a light most favorable to the nonmoving party.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## I.   Validity of the Copyright

### A. Burden of Proof

The Defendants in this declaratory judgment action own the copyrights to the Song.  They bear the burden to demonstrate the validity of that copyright while the Plaintiffs bear the burden belonging to a party bringing a summary judgment motion.

The parties hotly contest whether the burden to prove validity of the copyright rests on the Defendants.  The Supreme Court recently resolved this issue.  See Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843 (2014); see also Marya v. Warner/Chappell Music, Inc., 131 F. Supp. 3d 975, 983–84 (C.D. Cal. 2015).  In Medtronic, the plaintiff-licensee sought a declaratory judgment that its products did not infringe the defendant's patents.  134 S. Ct. at 847.  The Court noted that a patentee ordinarily bears the burden of proving infringement.  Id. at 846.  It held that "when a licensee seeks a declaratory judgment against a patentee to establish that there is no infringement, the burden of proving infringement remains with the patentee."  Id.  The burden should not depend

on the form of the action, because "failure of one party to
carry the burden of persuasion on an issue should not establish
the issue in favor of an adversary who otherwise would have the
burden of persuasion on that issue in later litigation." Id. at
850 (citation omitted).  If the burden of persuasion shifted to
the plaintiff in a declaratory judgment suit, that litigation
would "have failed to achieve its object: to provide an
immediate and definitive determination of the legal rights of
the parties." Id. (citation omitted).

In opposition to this motion for summary judgment, the
Defendants rely heavily on their certificates of copyright
registrations to defend the validity of their copyrights.  While
a certificate of copyright registration "creates a presumption
of copyrightability, the existence of a registration certificate
is not dispositive." Woods v. Bourne Co., 60 F.3d 978, 990 (2d
Cir. 1995).  "Extending a presumption of validity to a
certificate of copyright merely orders the burdens of proof."
Carol Barnhart, Inc. v. Econ. Cover Corp., 773 F.2d 411, 414 (2d
Cir. 1985) (citation omitted).  The "presumption of validity may
be rebutted where other evidence in the record casts doubt on
the question", such as "evidence that the work had been copied
from the public domain." Fonar Corp. v. Domenick, 105 F.3d 99,
104 (2d Cir. 1997) (citation omitted).  "Where evidence in the

record casts doubt on the validity of the copyright, validity will not be assumed."  Urbont v. Sony Music Entm't, 831 F.3d 80, 89 (2d Cir. 2016).

The Defendants may not rely on a presumption of validity in this action, a presumption on which they rely heavily in opposition to this motion.  The Plaintiffs have offered more than sufficient evidence to rebut the presumption.  They have shown that the Defendants' 1960 and 1963 applications for a copyright in the Song were significantly flawed.

First, while the applications were for registration as a work derivative of another work, the applications do not identify as that other work the Folk School Version, the PSI Version, the Cherry Lane Version, the Sing Out Lyrics, or any other version of the spiritual that Horton learned from the striking workers.  The application lists a previously registered work, "I'll Overcome," which appears to be a reference to the Tindale hymn "I'll Overcome Someday" that was registered in 1900.[18]

---

[18] In their motion to dismiss and interrogatory responses, the Defendants represented that "I'll Overcome" was a reference to the song "I'll Overcome Someday" by Charles Albert Tindley, a hymn registered with the Copyright Office in 1900.  The melody of "I'll Overcome Someday" is different than the Song's melody, as Seeger notes on the 1963 Tape, and Brackman notes in a July 1963 memo.

In opposition to this motion, the Defendants state that

Second, the applications to register the Song do not clearly identify the two differences in the words in Verse 1/5 on which the Defendants now rely to claim originality in their derivative work: "shall" and "deep."[19]  The 1960 Application claims protection for "New words," but only specifically identifies as new lyrical material verses two through four.  The 1963 Application also claims protection for "New words," but only specifically identifies as new lyrical material verses six through eight.

Third, the 1960 application does not list Seeger, who the Defendants claim changed the word "will" to "shall" in Verse 1/5.  Again, it is this difference on which the Defendants most heavily rely to defend their copyright.[20]

---

"[a]fter reviewing the documents exchanged in discovery and conducting further research, the Defendants believe that it is possible that Carawan and/or Hamilton may have meant the reference to 'I'll Overcome' to refer to a variant of the negro spiritual 'I'll Be Alright.'"  This is the song referenced in the 1963 Wally Hille letter to Seeger.  "I'll Be Alright" includes a verse with the lyrics "I'll overcome someday."

[19] The applications generally claim "[m]elody has been changed", but do not specify what those changes are.  It is undisputed that there are significant differences between the melodies of the Tindley hymn "I'll Overcome Someday" and the Song.

[20] Given the second copyright application for the Song -- in which Seeger's name was added as an author -- this omission from the first application would not be sufficient by itself to rebut the presumption.  It is a significant enough omission, however, to add it to the list of serious deficiencies in the

33

Finally, in arguing that the presumption is rebutted, the Plaintiffs rely upon the strong similarity of the PSI Version to Verse 1/5 of the Song.  Without a sufficiently original contribution to Verse 1/5, the Song's Verse 1/5 does not qualify for copyright protection as a derivative work.  This similarity, coupled with the failure to clearly identify the PSI Version of the Song as the Song's antecedent is also sufficient to rebut the presumption of validity.  Therefore, the Defendants may not rest on a presumption that their copyrights are valid and they bear the ultimate burden of showing the validity of those copyrights without the weight added by that presumption.

**B. Originality**

The Plaintiffs principally rest their assertion that Verse 1/5 of the Song is in the public domain on a comparison between that verse in the Song and in one of its antecedents, the PSI Version.  The parties agree that the PSI Version of the Song, which was published in a magazine in 1948, predated the Song. The magazine in which the PSI Version appeared identified it as a song learned by Horton from striking CIO workers in Charleston.  The PSI Version is now in the public domain.[21]

---

applications.

[21] A copyright for the magazine in which the PSI Version appeared was obtained in 1948 and expired in 1976.  It was not renewed.

34

The Defendants contend that Verse 1/5 of the Copyrighted Song is sufficiently transformative and original that it was and is eligible for copyright protection as a derivative work.  The question presented by the parties is whether the changes to the most well-known verse of the Song, Verse 1/5, embody the originality required for protection by the Copyright Act.[22]

The Constitution provides that "Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries".  U.S. Const. art. I, § 8, cl. 8.  This constitutional grant of authority to create a copyright is given in express recognition of the primacy of the public interest.  See TCA Television Corp. v. McCollum, 839 F.3d 168, 177 (2d Cir. 2016).  "[T]he primary purpose of copyright is not to reward the author, but is rather to secure 'the general benefits derived by the public from the labors of authors.'"  New York Times v. Tasini, 533 U.S. 483,

---

It is unnecessary for purposes of this motion to explore the extent to which the copyright for the magazine may have once provided protection for the PSI Version of the Song contained in the magazine.

[22] While the Plaintiffs seek to invalidate the two copyrights for the Song due to fraud, they do not separately challenge the Defendants' copyrights as to verses other than Verse 1/5, or as to the arrangement for the Song.

519 (2001) (Stevens, J., dissenting) (citation omitted).  "[T]he authorization to grant to individual authors the limited monopoly of copyright is predicated upon the dual premises that the public benefits from the creative activities of authors, and that the copyright monopoly is a necessary condition the full realization of such creative activities."  Melville B. Nimmer & David Nimmer, 1 Nimmer on Copyright § 1.03[A] [hereinafter "Nimmer"]; Barton Beebe, Bleistein, the Problem of Aesthetic Progress, and the Making of American Copyright Law, 117 Colum. L. Rev. 319, 341 (2017) ("The Framers likely included the Progress Clause both to justify and to limit in some way the extraordinary grant of monopoly rights provided for by the Exclusive Rights Clause.").  As the Honorable Pierre Leval has explained, "[t]he copyright is not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public."  Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1107 (1990).

Copyright protection extends to "original works of authorship fixed in any tangible medium of expression" such as "musical works, including any accompanying words."  17 U.S.C. §§ 102(a) and (a)(2); 16 Casa Duse, LLC v. Merkin, 791 F.3d 247,

36

256 (2d Cir. 2015).  "The sine qua non of copyright is
originality."  <u>N.Y. Mercantile Exch., Inc. v.
IntercontinentalExchange, Inc.</u>, 497 F.3d 109, 113 (2d Cir.
2007).  Originality in the copyright sense means only that the
work owes its origin to the author, i.e., is independently
created rather than copied from other works.  1 Nimmer
§ 2.01[A][1] (citing <u>Feist Publ'ns, Inc. v. Rural Tel. Serv.
Co.</u>, 499 U.S. 340, 345 (1991)).  Originality requires "at least
some minimal degree of creativity.  The work need not be
particularly novel or unusual.  The requisite level of
creativity is extremely low; even a slight amount will suffice."
<u>Scholz Design, Inc. v. Sard Custom Homes, LLC</u>, 691 F.3d 182, 186
(2d Cir. 2012) (citation omitted).  As explained by Nimmer,
"there is a reciprocal relationship between creativity and
independent effort: the smaller the effort (e.g., two words) the
greater must be the degree of creativity in order to claim
copyright protection."  1 Nimmer § 2.01[B][3].  "Melody is, of
course, the usual source of protection for musical
compositions."  1 Nimmer § 2.05[B].

  The subject matter of copyright includes derivative works.
A derivative work is one that is "<u>substantially</u> copied from a
prior work."  1 Nimmer § 3.01; <u>see</u> <u>Well-Made Toy Mfg. Corp v.
Goffa Int'l Corp.</u>, 354 F.3d 112 (2d Cir. 2003), <u>abrogated on</u>

other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154
(2010).  The copying by the derivative work is so substantial
that it would infringe the prior work unless the copyright owner
had given consent or the copied work was in the public domain.
See Keeling v. Hars, 809 F.3d 43, 48 (2d Cir. 2015).

     To be a derivative work, of course, it must incorporate and
copy that which is subject of copyright.  "If what is borrowed
consists merely of ideas and not of the expression of ideas,
then, although the work may have in part been derived from prior
works, it is not a derivative work."  1 Nimmer § 3.01.

     "The statute defines derivative works largely by example,
rather than explanation."  Authors Guild v. Google, Inc., 804
F.3d 202, 215 (2d Cir. 2015).  The examples in the statute are
as follows:

>     A work based upon one or more preexisting works, such as a
>     translation, musical arrangement, dramatization,
>     fictionalization, motion picture version, sound recording,
>     art reproduction, abridgment, condensation, or any other
>     form in which a work may be recast, transformed, or
>     adapted.  A work consisting of editorial revisions,
>     annotations, elaborations, or other modifications which, as
>     a whole, represent an original work of authorship, is a
>     "derivative work."

17 U.S.C. § 101 (emphasis supplied).  "Paradigmatic examples of
derivative works include the translation of a novel into another
language, the adaptation of a novel into a movie or a play, or
the recasting of a novel as an e-book or an audiobook."  Authors

38

<u>Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 95 (2d Cir. 2014).

The Song was copyrighted in 1960 and 1963.  Prior to the 1978 effective date of the Copyright Act of 1976, derivative works were afforded protection by § 7 of the Copyright Act of 1909.  It provided that:

> Compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works . . . shall be regarded as new works subject to copyright under the provisions of this title.

17 U.S.C. § 7 (repealed effective 1978).[23]  Treatises and caselaw referred to the "new works" protected under § 7 of the 1909 Act as "derivative works."  <u>Shoptalk, Ltd. v. Concorde-New Horizons Corp.</u>, 168 F.3d 586, 591 (2d Cir. 1999).

"The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."  17 U.S.C. § 103(b).  The copyright in the derivative

---

[23] As explained by the United States Copyright Office in 1977, "The new law continues and clarifies the principle of existing law that copyright in new versions covers only the new material and does not enlarge the scope or duration of protection in preexisting works.  . . . The term 'new versions' is changed to 'derivative works.'"  United States Copyright Office, <u>General Guide to the Copyright Act of 1976</u> 3:2 (September 1977).

work "is independent of, and does not affect or enlarge the
scope, duration, ownership, or subsistence of, any copyright
protection in the preexisting material."  Id.  Thus, in the
context of an underlying work that is in the public domain, a
copyright in a derivative work provides protection "only for the
increments of expression beyond" what is contained in the public
domain work.  Silverman v. CBS Inc., 870 F.2d 40, 50 (2d Cir.
1989).

In order to qualify as a derivative work, a work "must be
independently copyrightable."  Woods, 60 F.3d at 990.  One who
slavishly copies from others "may not claim to be an author."
L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 490 (2d Cir.
1976) (citation omitted).  "[W]hile a copy of something in the
public domain will not, if it be merely a copy, support a
copyright, a distinguishable variation will."  Id.  (citation
omitted).  The added material must demonstrate "more than a
modicum of originality.  This has been interpreted to require a
distinguishable variation that is more than merely trivial."
Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir.
1994).  In an oft-quoted formulation, the Second Circuit has
explained that the work must "contain some substantial, not
merely trivial originality."  L. Batlin & Son, 536 F.2d at 490
(citation omitted).  "To extend copyrightability to minuscule

variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work." <u>Id.</u> at 492.

Special caution is appropriate when analyzing originality in derivative works, "since too low a threshold will give the first derivative work creator a considerable power to interfere with the creation of subsequent derivative works from the same underlying work." <u>Woods</u>, 60 F.3d at 990 (citation omitted). This caution is particularly appropriate when assessing whether a version of a song may qualify as a derivative work. Applying these principles, the Court of Appeals has observed that "stylized versions of the original song," such as a "cocktail pianist variations of the piece that are standard fare in the music trade by any competent musician," are insufficient to satisfy the requirement of originality. <u>Id.</u> at 991. For a musical composition to qualify as a derivative work,

> there must be something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where a major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune. It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material.

<u>Id.</u> (citation omitted). Accordingly, "the demonstration of 'physical skill' or 'special training,'" in contributing new

41

material to the original song is insufficient by itself to satisfy the requirement of originality.  Id. (citation omitted).

As noted above, the statute requires that the originality of a derivative work be judged by an examination of the work "as a whole."  17 U.S.C. § 101.  Nimmer explains, "In terms of the necessary creativity, it has been held that, although a musical theme may be suggestive of prior works, it suffices if the overall impression is of a new work."  1 Nimmer § 2.05[B].  See also id. § 2.05[D] (noting "tendency to require a greater degree of originality in order to accord copyright in a musical arrangement").

The need to examine the derivative work as a whole is entirely consistent with the law of copyright more generally. In determining substantial similarity for purposes of copyright infringement, the Second Circuit has

> disavowed any notion that we are required to dissect
> the works into their separate components, and compare
> only those elements which are in themselves
> copyrightable.  Instead, we are principally guided by
> comparing the contested design's total concept and
> overall feel with that of the allegedly infringed
> work, as instructed by our good eyes and common sense.

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010) (Katzmann, C.J.) (citation omitted) (finding architectural design for mixed-use downtown development did not infringe copyrighted design); see Petrella v. Metro-

42

Goldwyn-Mayer, Inc., 134 S. Ct. 1962, 1977 (2014) (quoting with
approval the standard set forth in Peter F. Gaito).

Guidance from the Copyright Office in 1973 states that
"[m]inor changes in existing music, such as any musician might
readily make, and which are not substantial enough to constitute
original composition, do not create a new version."  Copyright
Office Practices ¶ 2.6.4(III)(b) (1973).  The Copyright Office
explained that the following changes did not create registrable
new versions of pre-existing works: "1) The change of a few
notes in the melody of 'The Star Spangled Banner'; 2) Mere
transposition of an old song into a different key; 3) The
omission of two measures from an old song."  Id.

These principles are in harmony with the related principle
that common phrases lack originality and are not eligible for
copyright protection.  See, e.g., Acuff-Rose Music, Inc. v.
Jostens, Inc., 155 F.3d 140 (2d Cir. 1998).  "[W]ithout
independent creation, [] lyric lines are not protected by
copyright."  Id. at 144; 1 Nimmer § 2.01[B][3].

Applying these principles of law, the Plaintiffs have shown
that the melody and lyrics of Verse 1/5 of the Song are not
sufficiently original to qualify as a derivative work entitled

43

to a copyright.[24]  As a matter of law, the alterations from the
PSI Version are too trivial.  A person listening to Verse 1/5 of
the Song would be hearing the same old song reflected in the
published PSI Version with only minor, trivial changes of the
kind that any skilled musician would feel free to make.  As §
101 of the Copyright Act teaches, a judgment about modification
to an original work must be based on a consideration of the
derivative work "as a whole."  17 U.S.C. § 101.

     More specifically, the changes of "will" to "shall" and
"down" to "deep" and the melodic differences in the opening
measures and the seventh measure, do not create a
distinguishable variation.  These differences represent
"variations of the piece that are standard fare in the music
trade by any competent musician."  Woods, 60 F.3d at 991
(citation omitted).

     The record shows that the listed authors of the Copyrighted
Song were well aware of the historic and to them venerable roots
of the Song.  They sought to copyright the Song in order to

---

[24] The parties agree that the analysis regarding originality is
properly conducted with respect to Verse 1/5 standing alone.
This is the verse which the Plaintiffs contend is in the public
domain.  The Plaintiffs do not dispute for purposes of this
motion the authorship or originality of the lyrics in the
remaining verses of the Song.

protect it from undesirable commercial exploitation.[25]  In opposing this motion, the Defendants emphasize their own and the listed authors' virtuous motives.  But, unless Verse 1/5 qualifies as a derivative work under the ordinary application of copyright law, that protection is unavailable for that verse. These principles regarding the creation of copyright protection for derivative works apply equally whether the original work is humble or distinguished and whether it is noble or quite the opposite.  The gap in the proof of originality cannot be filled by good intentions.

The Plaintiffs have more than carried their burden on summary judgment to show that Verse 1/5 of the Song lacks the originality required for protection as a derivative work.  The burden having shifted to them, the Defendants have failed to offer evidence of originality that raises a material question of fact requiring a jury trial.

In opposing this motion, the Defendants have relied heavily on the presumption of validity given to copyrighted works.  For the reasons explained above, however, that presumption is

---

[25] As noted above, the two applications for copyrights for the Song explicitly identify the new words to which the copyright protection would apply as the words in verses 2 to 4 and 6 to 8. Neither application identified any words from Verse 1/5.

unavailable to them.

The Defendants next argue that disputed issues of material fact prevent a finding through summary judgment that the changes to Verse 1/5 of the Song are merely trivial.  Although they have identified four differences in Verse 1/5, they emphasize only one: the change of the word "will" to "shall."  They argue that this word change was transformative because the two words have different meanings.  "In the context of the first person ('I' and 'we'), 'shall' is used to form the simple future tense, while 'will' is used to express a strong determination to do something."  The Defendants contend that the word "shall" carries a sense of solemnity that is absent from the word "will" and is better fitted to the peaceful, non-violent Civil Rights Movement that adopted the Song.

This single word substitution is quintessentially trivial and does not raise a question of fact requiring a trial to assess whether it is more than trivial.  The words will and shall are both common words.  Neither is unusual.  Grammatically, both words perform similar functions in a phrase or sentence, as they were here.  They can be readily substituted in a sentence.

The Defendants do not explicitly contend that a change in a single word, much less a single common word, entitles a

46

derivative work to copyright protection and have cited no
authority that would support such a conclusion.  Even more
significantly, when judged from the perspective of Verse 1/5 "as
a whole," the one-word change did not create a distinguishable
variation.  17 U.S.C. § 101.  Any finding to the contrary would
substantially expand the scope of protection for derivative
works.  The implications of such an expansion would be
significant.  That expansion would impact the rights of
copyright owners of original works, would limit access to works
in the public domain, and would make the differentiation among
competing holders of purportedly derivative works difficult.

In recognition that their copyright in Verse 1/5 is for a
musical composition composed of both words and music whose
eligibility for copyright protection requires examination of the
work "as a whole," 17 U.S.C. § 101, the Defendants next argue
that even if the words "shall" and "deep" are common words and
their addition lacks originality, when considered with the
changes to the music, they create a non-trivial distinguishable
variation from the PSI Version of the Song.  But, the analysis
performed above considered the four differences together in the
context of Verse 1/5 taken as a whole.  It is that holistic
analysis that drove the conclusion that Verse 1/5 of the Song
does not represent a distinguishable variation.

47

As the comparison of the music of the PSI Version and the Copyrighted Song shown above illustrates, the melodic differences were, as a matter of law, trivial.  There is no change to the overall melody of Verse 1/5.  Two utterly trivial differences appear.  In each instance, the difference occurs during a melodic descent.  The starting note and ending note in that descent are the same.  In one instance, the descent begins one beat later, and an eighth note (an "F") is added.  In the other, a trill is added.

This conclusion that the differences are indisputably trivial is, if anything, reinforced by considering the Defendants' own evidence.  As Seeger explained in the 1963 Tape, and demonstrated by singing, there were several subtle variations in the way "We Shall Overcome" was being sung at the time, each reflecting the preferences of either Seeger, Horton, Carawan, Hamilton, or "Negroes in the South."  He treated each as equally genuine and as a reflection of a folk song evolving and shifting with its use in the community and its performance by many different singers.  Seeger's description provides no basis for making any clear distinction among the several versions, much less between the melody in the PSI Version and the Copyrighted Song.  The audience for any of these versions would believe they were listening to basically the same song.

48

The Defendants further argue that the popularity and widespread adoption of the Copyrighted Song is proof that the four changes to Verse 1/5 at issue here are "more than merely trivial."  As they put it, it is the Song and not the PSI Version of the Song that serves "as the anthem of the Civil Rights Movement."  There are several problems with this <u>post hoc ergo propter hoc</u> argument.

First, the Defendants have offered no evidence that the version of "We Shall Overcome" sung in the streets during the Civil Rights Movement was in fact faithful to the Copyrighted Song.  They have certainly pointed to no evidence that the modest differences in the melody reflected in the Song (when compared to the PSI Version) were the ones that everyone sang.  As Seeger described in the 1963 Tape, the Song was "right in the mainstream of the folk process, and it's swirling along now."

Second, the evidence offered by the Defendants regarding the popularity of the song "We Shall Overcome" in the decades that followed the issuance of its copyright is offered through an expert report, discussed below, which is excluded pursuant to <u>Daubert</u>, 509 U.S. 579.  In any event, that report does not purport to attribute the popularity of "We Shall Overcome" during the Civil Rights Movement to any particular feature of the Song, much less to the four differences in the Song on which

49

the Defendants rely to distinguish it from the PSI Version.  The
expert contends that the use of the word "shall" was an
important element of the Song, but does not contend that a
version of the Song without the word "shall" would not have
gained as much popularity.

Finally, the fact that a trivial change to the lyrics
became a part of a popular version of a song does not render
that change nontrivial and automatically qualify the popular
version for copyright protection.  Popularity does not equate
with originality.  While the Song's popularity may make the
difference between "will" and "shall" discernible to today's
listeners, it does not render the change between the two words
nontrivial.

The Defendants next argue, relying on Weissmann v. Freeman,
868 F.2d 1313 (2d Cir. 1989), that Verse 1/5 of the Song may be
protected as a derivative work even if the differences in it,
when compared to the PSI Version or other predecessors, were
miniscule and lacked originality.  That is not the law.  In
Weissmann, the Second Circuit described the relevant legal
standards for judging originality.  These standards are entirely
consistent with those recited above.  Weissmann recognized that
the author of a derivative work must contribute "something more
than a merely trivial variation, something recognizably his

50

own". Id. at 1321 (citation omitted).  Applying these standards, it reversed the district court's finding that the author's contributions were minuscule and demonstrated little originality, and held that the trial court had failed to give detailed consideration to all of the new matter and the several new elements that the author had added to the prior work.  Id. at 1321-22.  Weissmann provides no basis to revisit the conclusion that the differences in Verse 1/5 of the Song were trivial.

The Defendants rely as well on Nimmer's statement that "the original elements contributed in reducing a folk song to tangible form -- at least if that form differs from known prior versions -- permits a claim of copyright."  1 Nimmer § 2.05[B]. Nimmer's statement is inapposite to the instant case.  This passage, and the cases that Nimmer cites to support the observation,[26] address a transformation in the form of the work. The Defendants do not contend that they were the first to transcribe the words and melody to "We Shall Overcome."  The PSI Version (and the even earlier "Folk School Version") had already reduced versions of "We Shall Overcome" to standard notation.

---

[26] Wihtol v. Wells, 231 F.2d 550, 552 (7th Cir. 1956); Italian Book Co. v. Rossi, 27 F.2d 1014, 1014 (S.D.N.Y. 1928).

Finally, the Defendants rely on two expert reports.  As described below in a discussion of the Plaintiffs' Daubert motion, neither report creates an issue of fact requiring a jury trial.

**C. Authorship**

The Plaintiffs also contend that there is insufficient evidence that any of the four authors identified in the application for the Song's copyright actually contributed the four differences between Verse 1/5 in the Song and the PSI Version that are at issue here.  Specifically, they contend that there is no evidence that three of those authors made any of the changes and that there is no evidence that the fourth author -- Seeger[27] -- made the changes to the melody.  As for the two changes to the lyrics, they argue that there is no admissible evidence that Seeger made even those changes.

The Copyright Act only protects "works of authorship."  17 U.S.C. § 102(a); 16 Casa Duse, LLC, 791 F.3d at 256.  "To qualify for copyright protection, a work must be original to the author."  Feist, 499 U.S. at 345.  "[T]he author is the party

---

[27] Seeger was listed as an author in the 1963 copyright application, which added additional verses to the Song, but not in the 1960 application, which first contained Verse 1/5.  The 1963 application does not specifically identify Seeger as the author of Verse 1/5.

who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989); Shaul v. Cherry Valley-Springfield Cent. Sch. Dist., 363 F.3d 177, 185 (2d Cir. 2004). "[T]he one indispensable element of authorship is originality." 1 Nimmer § 1.06[A]. Copyright protection for derivative works therefore extends "only to the material contributed by the author of such work." 17 U.S.C. § 103; Waldman Pub. Corp., 43 F.3d at 782.

The Defendants have presented sufficient evidence to raise a material question of fact regarding the authorship of the two differences in the lyrics and the two differences in the melody in Verse 1/5. Several documents created more than 20 years ago indicate that Seeger may have changed "will" to "shall." These are the 1963 Tape and the books from 1982 and 1993. While Seeger does not always claim that he is responsible for this change, it is the task of the fact finder to sort through the conflicting evidence. The 1963 Tape provides evidence as well that Seeger may have changed "down" to "deep" and that Carawan and Hamilton may have been responsible for the melodic differences in measures one and two and in measure seven in the

Song when it is compared to the PSI Version.[28]

The Plaintiffs challenge the authenticity of the 1963 Tape and the admissibility of each of the statements of authorship on hearsay grounds.[29] "Authentication is governed by Federal Rule of Evidence 901, which requires only that 'the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'" United States v. Ganias, 824 F.3d 199, 215 n.33 (2d Cir. 2016) (quoting Fed. R. Evid. 901(a)). "[T]his requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Id. (citation omitted). Proof of authenticity can be based entirely on circumstantial evidence. United States v. Bagaric, 706 F.2d 42, 67 (2d Cir. 1983), abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994).

---

[28] In the 1963 Tape, Seeger mentions that "Negroes in the South" prefer a particular melody.  This melody appears to include the melodic elements in the copyrighted Song that are at issue here. Seeger explains as well that Carawan and Hamilton "made" those changes.  Whether Seeger meant that Carawan and Hamilton created those elements or only that they adopted and popularized a version with those elements cannot be resolved in this motion.

[29] Solely for purposes of this motion, it is assumed that the pertinent statements in these documents are admissible for their truth under the residual hearsay exception or because they are contained in ancient documents.  See Fed. R. Evid. 807, 803(16).

The 1963 Tape was produced by the Defendants during discovery from Ludlow's files.  The Tape purportedly records Seeger's voice, of which there are many recordings for comparison.  It is therefore likely that the Defendants will be able to authenticate the 1963 Tape at a trial.  For this reason, the motion for summary judgment on the issue of the authorship of the changes to Verse 1/5 is denied.

### D. Divestment

The Plaintiffs argue in the alternative that the Defendants were divested on two separate occasions of all rights in the lyrics to Verse 1/5 of the Song through publication of those lyrics without the requisite copyright notice.  The first occurred in June 1960 when Seeger's magazine -- Sing Out! The Folk Song Magazine -- published the Sing Out Lyrics; and the second occurred with the same magazine's April-May 1961 publication of the Sing Out Version.  The Plaintiffs assert that Verse 1/5 was contributed to the public domain when it was published without copyright notice.

The Defendants argue that the Sing Out Lyrics are not divesting because the printing of the lyrics was a fair use. They also argue that there is no evidence that Ludlow, the copyright owner, consented to the publication, which is required for a publication to divest the owner of copyright.  See 1

55

Nimmer § 4.03[A].  As to the publication of the Sing Out
Version, they argue that, again, there is no evidence of
Ludlow's consent.  Plaintiffs do not pursue the divestment
argument in their reply brief, and their motion for summary
judgment on this ground is denied.

**E. Fraud on the Copyright Office**

The Plaintiffs seek to invalidate both copyrights in their
entirety based on fraud on the Copyright Office.  A party
seeking to establish a fraud on the Copyright Office bears a
heavy burden.  The party asserting fraud must establish that the
application for copyright registration is factually inaccurate,
that the inaccuracies were willful or deliberate, and that the
Copyright Office relied on those misrepresentations.[30]  See Fonar
Corp., 105 F.3d at 105.

The Plaintiffs principally argue that the applicants for
the copyright in the Song deliberately omitted from their
applications all reference to its actual antecedents, including
the public domain spiritual and prior publications of "We Will

---

[30] "In any case in which inaccurate information . . . is alleged,
the court shall request the Register of Copyrights to advise the
court whether the inaccurate information, if known, would have
caused the Register of Copyrights to refuse registration."  17
U.S.C. § 411(b)(2); DeliverMed Holdings, LLC v. Schaltenbrand,
734 F.3d 616, 624 (7th Cir. 2013) (vacating district court
judgment for failure to follow "a clear statutory directive").

Overcome" and "We Shall Overcome."  Instead, they identified the antecedent as a work that bore little similarity to the Song or the Song's actual antecedents.  The Plaintiffs also contend, among other things, that the applicants committed fraud when they failed to identify unnamed African Americans as the true authors of the Song.  The existence of fraud cannot be resolved on summary judgment.  The Defendants have offered a number of arguments in opposition to this prong of the motion which it will require a trial to resolve.

## II.  The <u>Daubert</u> Motion Regarding Expert Reports

The Plaintiffs challenge the Defendants' two expert reports pursuant to <u>Daubert</u>, 509 U.S. 579.  Federal Rule of Evidence 702 grants "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" testimonial latitude unavailable to other witnesses, provided that (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; <u>Daubert</u>, 509 U.S. at 592.  "The proponent of the expert testimony has the burden to establish these admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the expert's testimony both rests on a reliable foundation and is relevant to the task at

hand." In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 658 (2d Cir. 2016) (citation omitted).

In all events, an expert must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citation omitted); see id. at 587 (quoting Fed. R. Evid. 401) ("Relevant evidence is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence.'").

In order to be admissible, a relevant expert opinion must be "based on sufficient facts or data" and "the product of reliable principles and methods that the witness has reliably applied to the facts of the case." In re Pfizer, 819 F.3d at 658 (citation omitted). Admissibility "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006).

The Plaintiffs have submitted an export report from Michael D. Harrington ("Harrington"), Program Faculty Chair of the Music Business program at SAE Institute and a Professor of Music at

Berklee College of Music.  Harrington, an expert in musicology, places the Song in the context of American folk music.  He opines that "[a]s an art form, folk music is a process of minor and fleeting incremental changes to pre-existing work, typically work that has no known author or work that is already in the public domain, which occur most often during performances. Notes are changed again and again . . . and specific words are changed, added, or deleted at least as often."  In Harrington's detailed report, he compares several different elements of the Song and the PSI Version and examines as well the four differences on which the Defendants have relied to identify originality in Verse 1/5 of the Song.  Harrington concludes that the various changes over time to the music and lyrics of "We Shall Overcome" are in keeping with the folk music tradition and that the four differences between Verse 1/5 of the Song and the PSI Version are trivial.  The Defendants have not challenged Dr. Harrington's expertise nor the rigor of his analysis.

The Defendants submitted two expert reports, which the Plaintiffs challenge.[31]  They are from (1) Lawrence Kramer

_____

[31] As noted above, the Defendants had earlier commissioned an expert report from Lawrence Ferrara, Ph.D., a musicologist, to defend against a threatened suit by the heirs of Louise Shropshire.  In that report, the Defendants' expert concluded that the PSI Version is the precursor to the Song and that the Song and its PSI Version are "virtually the same."  The

("Kramer"), a Professor of English and Music at Fordham University, and (2) David J. Garrow ("Garrow"), a Professor of Law and History & Distinguished Faculty Scholar at the University of Pittsburgh School of Law.

## A. The Kramer Report

Kramer explains that he is an expert in "musical hermeneutics," which he defines as the "study of how musical works, performances, and practices acquire meaning, and the practice of interpretation by which the meaning thus acquired is elucidated."  He was retained to "assess the meaning of the anthem ['We Shall Overcome'] as a musical composition and to determine whether the meaning of 'We Shall Overcome' is different from 'We Will Overcome,'" as embodied in the PSI Version.  He opines that the two works "possess an independent meaning that is more than sufficient to justify" the Song's "protected status."  As he explains, the change from "will" to "shall" is "pivotal" to his analysis, and it is on that change that his report concentrates.  Beginning with examples from Shakespeare, Kramer explains that "shall" indicates "simple futurity" while "will indicates the force of volition."  In his

---

Defendants have not offered this report in opposition to this motion for summary judgment.  The report has been offered by the Plaintiffs.

view, a correct use of the word "shall" is a mark of gravitas
and solemnity.  Kramer discusses as well, albeit briefly,
melodic and rhythmic differences between the Song and the PSI
Version.  He concludes that the Copyrighted Song is a
distinguishable variation that was "more than merely trivial",
and that the differences between the PSI Version and the Song
are what made the Copyrighted Song "the unique phenomenon that
it is."

Kramer's expert report does not create an issue of fact
regarding whether the four differences that the Defendants have
identified between the PSI Version and the Copyrighted Song
reflect a sufficiently original contribution to qualify the Song
for copyright protection as a derivative work.  The Defendants
have not shown that Kramer's opinion from the field of musical
hermeneutics is relevant to or will assist the trier of fact in
assessing the issue of originality.[32]  Kramer's opinion is
offered almost exclusively in support of the Defendants'

---

[32] It appears that no court has identified musical hermeneutics
as a field of expertise that provides sufficiently reliable
analysis to be admissible in court proceedings.  The Plaintiffs
argue that this Court should not be the first to do so.  Because
the opinions proffered here by Dr. Kramer based on hermeneutics
are irrelevant and not sufficiently helpful to a fact finder to
be admissible on the issue of originality in this case, it is
unnecessary to reach the Plaintiffs' more general argument.

argument, rejected for the reasons given above, that the adoption of a version of the Song by the Civil Rights Movement that used the word "shall" is confirmatory evidence that that single word change was momentous and created a distinguishable variation entitling the Song to copyright protection.

This ex post facto reasoning is also inadmissible under Fed. R. Evid. 403.  Its admission would threaten to mislead the jury into assessing the issue of originality based on their familiarity with a particular version of the Song containing the word "shall."

In response to the Plaintiffs' Daubert motion, the Defendants admit that the field of musical hermeneutics and its endeavour to interpret musical meaning is "somewhat subjective," but argue that Kramer's opinions regarding the meaning of the Song's lyrics will assist the trier of fact.  They also ask that Kramer be considered not only as an expert in the field of musical hermeneutics but also as an expert in the field of musicology and English.

Those portions of Kramer's report that reflect opinions derived from methodologies employed by field of musicology -- opinions like those given by the Defendants' expert Ferrara and the Plaintiffs' expert Harrington -- are properly offered through Kramer.  But, consideration of those portions of

Kramer's report which may be said to reflect his undoubted
expertise as a musicologist does not raise a question of fact
sufficient to defeat the summary judgment motion.

As already noted, Kramer's expert report focuses almost
exclusively on the significance of the word "shall."  He gives
only cursory attention to the melodic and rhythmic differences
between the PSI Version and the Copyrighted Song.  Kramer
mentions the flourish in measure seven of the Copyrighted Song
in a single passage, and restricts his discussion of it to its
hermeneutic significance.  Kramer discusses the difference in
measure two (repeated in measure four) from the perspective of
both hermeneutics and musicology.  But he does not analyze the
variation in a way that would assist the jury in evaluating the
extent to which the variation could be considered to be an
original contribution to the melody or rhythm in that measure.[33]

The core of Kramer's musicological analysis, as was true of
his hermeneutic analysis, is focused on the significance of the
word "shall."  But, as explained above, that single word change
does not, as a matter of law, represent a sufficiently original

---

[33] Kramer attempts to cure this deficiency by the submission of a
supplemental report on August 1, 2017 in opposition to the
motion for summary judgment.  That report is untimely.  But,
even if it were appropriate to consider it, and it is not, the
supplemental report would not affect the outcome of the motion
for summary judgment.

contribution to the Song to create a distinguishable variation entitling the Song to copyright protection as a derivative work. This remains so whether the variation is considered in the context of a single word, with the three other differences between the PSI Version and the Copyrighted Song, or from the perspective of the impact of all four of those differences on the Song's Verse 1/5 taken as a whole.

## B. The Garrow Report

Garrow attaches his article "We Shall Overcome and the Southern Black Freedom Struggle" to his expert report and relies on that article as the basis for his opinions.  Garrow is a renowned historian who has studied the "southern Black Freedom struggle," and authored among other important works, <u>Bearing the Cross: Martin Luther King, Jr., and the Southern Christian Leadership Conference</u>, a biography of Martin Luther King that won the Pulitzer Prize in 1987.  Garrow opines that, as demonstrated by his article, the song "We Shall Overcome" had a "special and central role in the Southern Black freedom struggle."  His article reviews in detail the history of the song from 1945, when a version was sung on a picket line in Charleston, South Carolina, to the 1960s, when President Lyndon B. Johnson invoked "we shall overcome" before a Joint Session of Congress in support of the passage of the Voting Rights Act of

64

1965.

While Garrow's opinion regarding the role of the song "We Shall Overcome" in the Civil Rights Movement would be entitled to great weight if the Song's role were in dispute, the Plaintiffs' motion for summary judgment is not addressed to that question.  Garrow's opinion on the role of the Song does not, therefore, raise a question of fact regarding the extent to which the Copyrighted Song may be sufficiently original, when compared to the PSI Version, to be a derivative work entitled to copyright protection.

Garrow also opines in his April 14, 2017 expert report that the song "'We Shall Overcome' presents sufficient originality and a distinguishable variation that is more than merely trivial as compared to the song 'We Will Overcome.'"  This opinion is, however, untethered to Garrow's article.  The article does not analyse the four differences at issue between the PSI Version and the Copyrighted Song; it does not mention the melodic differences at all.  While the article describes some of the changes to the lyrics, including most prominently the change from "will" to "shall", it does so as part of a chronological recitation of the role of the song in the Civil Rights Movement. While Garrow's report gives an opinion relevant to the issue of originality, that opinion is not admissible without a

description of the methodology and evidence that might support the opinion, and a showing that that opinion and methodology fall within the expert witness's field of expertise.  See In re Pfizer, 819 F.3d at 658.  Accordingly, the Plaintiffs' motion to strike Garrow's report is granted.

## CONCLUSION

The Plaintiffs' August 18, 2017 Daubert motion is granted in part as described above.  The Plaintiffs' June 20, 2017 motion for partial summary judgment is granted to the following extent: the Plaintiffs have shown, as a matter of law, that the Defendants have no valid copyright in the words and melody of the first verse of "We Shall Overcome" because it lacks originality.

Dated:    New York, New York
          September 8, 2017

_____
DENISE COTE
United States District Judge