**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WE SHALL OVERCOME FOUNDATION and BUTLER FILMS, LLC, on behalf of itself and all others similarly situated,

Plaintiffs,

v.

THE RICHMOND ORGANIZATION, INC. (TRO INC.) and LUDLOW MUSIC, INC.,

Defendants.

**C.A. No. 1:16-cv-02725-DLC**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION OR REARGUMENT**

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Mark C. Rifkin
Randall S. Newman
Gloria K. Melwani
Rifkin@whafh.com
Newman@whafh.com
Melwani@whafh.com
270 Madison Ave.
10th Floor
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS


TABLE OF CITATIONS .......... ii

I. INTRODUCTION .......... 1

II. LEGAL ARGUMENT .......... 3

A. This Case Was Not Attractive to Qualified Counsel .......... 3

B. The Lodestar of Defendants' Counsel Does Not Justify a 65% "Across-the-Board" Reduction in the Hourly Rates of Plaintiff's Counsel .......... 8

C. The Amount Recoverable by the Class Does Not Justify a 65% "Across-the-Board" Reduction in the Hourly Rates of Plaintiff's Counsel .......... 11

D. The Court's Fee Award is Inconsistent With the Important Policy Considerations of Section 505 .......... 12

III. CONCLUSION .......... 13

## TABLE OF CITATIONS

**CASES** **Page(s)**

*Arbor Hill Concerned Citizens Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2008) .......... 3, 8

*Fogerty v. Fantasy, Inc.*,
510 U. S. 517 (1994) .......... 8, 12

*John Wiley & Sons, Inc. v. Kirtsaeng*,
No. 08-cv-7834,
2013 U.S. Dist. LEXIS 179113 (S.D.N.Y. Dec. 20, 2013) .......... 6

*John Wiley & Sons, Inc. v. Kirtsaeng*,
605 F. App'x 48 (2d Cir. 2015) .......... 8

*Johnson v. Georgia Hwy. Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) .......... 7, 11

*Kirtsaeng v. John Wiley & Sons, Inc.*,
136 S. Ct. 1979 (2016) .......... 12

*Millea v. Metro-North R.R. Co.*,
658 F.3d 154 (2d Cir. 2011) .......... 8

*Simmons v. New York City Transit Auth.*,
575 F.3d 170 (2d Cir. 2009) .......... 3

**STATUTES & RULES**

Copyright Act,
17 U.S.C. § 505 .......... *passim*

Fed. R. Civ. P.,
59 .......... 1
60 .......... 1

Plaintiffs, We Shall Overcome Foundation ("WSOF") and Butler Films, LLC ("Butler"), hereby submit this Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration of the Attorneys' Fee Award.

## I. INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 59 and 60, Plaintiffs seek reconsideration or reargument of the Court's Opinion and Order (Doc. 164) ("Fee Award"), entered on July 31, 2018, awarding attorneys' fees in the amount of $352,000 to Plaintiffs as "prevailing parties" under Section 505 of the Copyright Act, 17 U.S.C. § 505. The principal issue raised in this motion – whether Plaintiffs' Counsel's hourly rates should be subjected to a 65% across-the-board reduction because the case would have been accepted by any number of talented lawyers on a *pro bono* or reduced fee basis – was not addressed by Plaintiffs' Counsel since it was not raised by Defendants in their lengthy opposition to the fee application.

In its Fee Award, the Court found that Plaintiffs' Counsel "were skillful and efficient" and that "[t]heir work deserves appropriate compensation." Doc. 164 at 21. Except for a handful of hours that Plaintiffs' Counsel spent responding to media inquiries about the case or reviewing media coverage of it,[1] *see id.* at 25, the Court found that the hours claimed by Plaintiffs' Counsel were "a reasonable reflection of the investment in time made by the skilled counsel representing the plaintiffs." *Id.* at 18. The Court also found that the hourly rates claimed by Plaintiffs' Counsel were "generally in-line with the rates charged for complex commercial litigation in the Southern District of New York" and were "comparable to the rates charged by Defense Counsel"

[1] The Court eliminated approximately $4,000 of time for media communications. Plaintiffs' Counsel believed, and still believe, that such communications were reasonable and necessary because of the intense public interest in the case and because for most of the time the case was pending it had been brought as a class action. However, in light of the small amount of time involved, Plaintiffs' Counsel do not seek reconsideration or reargument of the fee reduction for those few hours involved.

in the case.[2] *Id*. at 18-19.

Nonetheless, in awarding fees to Plaintiffs' Counsel, the Court decided to cut their hourly rates by 65%. Finding "no precise, mathematical formula that can determine the appropriate amount of the reduction," the Court imposed "an across-the-board reduction of 65%" on Plaintiffs' Counsel's lodestar. Doc. 164 at 21. The Court did so apparently believing that this was one of those "cases that would be attractive to many talented lawyers, either as candidates for *pro bono* or reduced-fee representation, or because they fulfill a lawyer's own reputational and societal goals, giv[ing] the reasonable fee-paying client substantial leverage in negotiating a fee." *Id*. In cutting Plaintiffs' Counsel's lodestar by 65%, the Court identified two benchmarks: (1) the fact that Defendants' counsel reduced their hourly rates by 50% in representing the Defendants; and (2) the amount reasonably recoverable if the case had proceeded as a common-fund class action. *Id*. at 20.

For the reasons discussed below, ***this*** case was ***not*** attractive to many talented lawyers for *pro bono* or reduced fee representation. Quite to the contrary, as discussed below, Isaias Gamboa contacted at least eight other law firms – including the same firm that eventually represented the Defendants in the litigation – before retaining Plaintiffs' Counsel to represent Plaintiff WSOF in the litigation on a contingent fee basis. None of those other firms was willing to do so except on an hourly basis – if at all. In addition, a comparison to the ***lodestar*** of Defendants' counsel does not support the 65% across-the-board reduction of the fees awarded to Plaintiff's Counsel. Nor

[2] The Court also reduced the hourly rates charged by Plaintiffs' Counsel for two paralegals who performed substantial work on the matter ***before*** applying the 65% "across-the-board" hourly rate discount. Plaintiffs' Counsel believe the hourly rates charged for those paralegals are appropriate. Again, in light of the small amount of time involved, Plaintiffs' Counsel do not seek reconsideration or reargument of the reduction in the paralegal hourly rates. However, for the reasons discussed herein, the reduced hourly rates for those paralegals should not also be subject to the 65% "across-the-board" hourly rate discount.

does the amount reasonably recoverable in a class action support that drastic reduction.

## II. LEGAL ARGUMENT

### A. This Case Was Not Attractive to Qualified Counsel

As the Court rightly held, *see* Doc. 164 at 15, Section 505 fee awards are based upon a calculation of the "presumptively reasonable fee," or what "'a reasonable, paying client would be willing to pay.'" *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill Concerned Citizens Ass'n v. County of Albany*, 493 F.3d 110, 112 (2d Cir. 2007), amended on other grounds by 522 F.3d 182 (2d Cir. 2007)). In *Arbor Hill*, the Second Circuit held that in setting an attorney's fee, the Court should enforce market discipline by approximating the fee negotiation that might take place were the client actually required to pay the attorney's fees. 522 F.3d at 184.[3] In doing so, the Second Circuit added, the Court should "consider whether a lawyer is willing to offer his services in whole or in part *pro bono*, or to promote the lawyer's own reputational or societal goals." *Id* at 192.

In its Fee Award, the Court noted that certain cases, which "would be attractive to many talented lawyers, either as candidates for *pro bono* or reduced-fee representation, or because they fulfill a lawyer's own reputational and societal goals, give the reasonable fee-paying client substantial leverage in negotiating a fee." Doc. 164 at 21. That may be correct as a general matter. However, the "inquiry *Arbor Hill* demands . . . is to determine the rate a reasonable, hourly-fee paying client would be willing to pay ***in the circumstances of a particular case***." Doc. 164 at 19 (emphasis added). That generalization is inapplicable here.

---

[3] *Arbor Hill* concerned application of the "forum rule," under which the Court uses "the prevailing hourly rate in the district where it sits to calculate what has been called the 'lodestar.'" 522 F.3d at 183. The "forum rule" is not relevant here, as the Court found that the hourly rates claimed by Plaintiffs' Counsel were consistent with the rates charged in the Southern District of New York. Doc. 164 at 18.

The question whether Plaintiffs could have retained talented counsel to represent them ***in this case*** on a *pro bono* or reduced fee basis never arose in the lengthy fee briefing.[4] Had it arisen, Plaintiffs' Counsel would have provided a factual basis for the Court to reject such an argument. As explained in the accompanying Declaration of Isaias Gamboa in Support of Motion for Reconsideration or Reargument ("Gamboa Decl."), no other law firm was willing to undertake the representation on such terms or at all. As explained in the accompanying Declaration of Randall S. Newman in Support of Motion for Reconsideration or Reargument ("Newman Decl."), Plaintiffs' Counsel did not agree to take on the case until they conducted their own extensive investigation of the legal and factual basis for the copyright challenge.

Before retaining Plaintiffs' Counsel to represent it in the action on a contingent fee basis, Mr. Gamboa approached at least ten other lawyers or law firms to represent him and Robert Anthony Goins Shropshire in litigation over the Song's copyrights. Gamboa Decl. ¶ 6. Mr. Shropshire is the grandchild of Louise Shropshire, who wrote "If My Jesus Wills," on which *We Shall Overcome* was purportedly based. *Id.* at ¶ 9; *see also* Doc. 87 at 3. One of those firms was Robins, Kaplan, Miller & Ciresi L.L.P. (now known as Robins Kaplan LLP, the same firm that represented the Defendants in the action). *Id.*

Messrs. Gamboa and Shropshire worked together on a documentary film about the Song for WSOF. Gamboa Decl. ¶¶ 6 & 9-11. In early 2013, after working with at least two other lawyers, they retained Yakub Hazzard, Esquire, of Robins Kaplan in Los Angeles to represent them on a *pro bono* basis in trying to establish recognition for Mrs. Shropshire's contribution to

[4] Defendants did not raise the issue in their opposition to the fee application. They may not have done so because Defendants' counsel, having declined the representation two or three years earlier, were well aware that Plaintiffs were unable to retain qualified counsel to represent them before they retained Plaintiffs' Counsel. Plaintiffs did not address the issue because it was not raised by Defendants in their opposition brief.

the Song. *Id*. at ¶¶ 6, 12, 16 & 21.

After being retained, Mr. Hazzard exchanged correspondence with Paul LiCalsi, Esquire, then a partner of Mitchell, Silberberg & Knupp, LLP in New York, regarding Mrs. Shorpshire's contribution to the Song. Gamboa Decl. ¶ 22. On May 16, 2013, Mr. LiCalsi sent a copy of the Ferrara Report to Mr. Hazzard. *Id.* at ¶ 23. As the Court knows, the Ferrara Report opines on "whether the Song was copied from 'If My Jesus Wills' and on the musical and lyrical origins of the Song." *Id*. In his letter to Mr. Hazzard on May 16, 2013, enclosing the Ferrara Report, Mr. LiCalsi claimed that the Song was derived from "We Will Overcome," published in September 1948 by People's Songs, Inc., in Vol. 3, No. 8 of *People's Songs* magazine (the "PSI Version"), not from "If My Jesus Wills." *See* Doc. 67 at 23-24.

On September 10, 2013, after the exchange of correspondence, Mr. Hazzard and Robins Kaplan ended their limited representation or Messrs. Gamboa and Shropshire.[5] Gamboa Decl. ¶ 24. Despite possessing Mr. Ferrara's admission that Defendants' copyrighted version of the Song was "virtually the same" as the public domain version published by PSI – which became a centerpiece of Plaintiffs' claim in this case – Mr. Hazzard and Robins Kaplan remained unwilling to commence litigation on their behalf regarding the Song's copyrights. *Id*. at ¶ 25. Before ending the representation, they never advised Mr. Gamboa or Mr. Shropshire on any strategy for invalidating the Song's copyrights. *Id*. at ¶ 26.

Aware that Mr. Hazzard and Robins Kaplan would not represent him and Mr. Shropshire if litigation became necessary, on July 9, 2013, Mr. Gamboa contacted Jonathan Pink, Esquire,

[5] In an ironic development, Mr. Hazzard and Mr. LiCalsi later switched firms. In late 2013, Mr. LiCalsi moved from Mitchell Silberberg to Robins Kaplan, bringing TRO and Ludlow Music with him as clients. In 2017, Mr. Hazzard joined Mitchell Silberberg.

of Bryan Cave LLP to represent them in possible litigation.[6] Gamboa Decl. ¶ 27. Despite expressing interest in their case, Mr. Pink demanded to be paid monthly by the hour at his full hourly rate of $680 and a large retainer to undertake the representation. *Id*. He estimated that the case "could easily cost more than a half-million to litigate." *Id*. Because Messrs. Gamboa and Shropshire could not afford the fees sought, Mr. Pink declined the representation later that same day. *Id*.

In addition to the lawyers and firms discussed above, Messrs. Gamboa and Shropshire sought out at least six other lawyers and law firms to represent them in trying to establish recognition for Louise Shropshire's contribution to the Song before Mr. Gamboa retained Plaintiffs' Counsel to represent WSOF. Gamboa Decl. ¶ 28. The other lawyers and firms they contacted included several well-known entertainment lawyers and Allan Dershowitz. *Id*. at ¶ 28. Like Robins Kaplan, none of those other lawyers or firms was willing to represent them or WSOF in any litigation over the Song's copyrights. *Id*. at ¶ 34. None of those other lawyers and firms was willing to commence litigation challenging Defendants' copyrights on any basis, either as a *pro bono* matter, a contingent fee matter, or even an hourly matter.[7] *Id*. Importantly, before Mr. Gamboa consulted with Plaintiffs' Counsel, none of those other law firms ever discussed with Mr. Gamboa a strategy to invalidate the Song's copyrights through litigation or otherwise. *Id*. at ¶¶ 26 & 31.

Plaintiffs' Counsel were the ***only*** one of at least nine law firms that Mr. Gamboa approached who were willing to commence litigation over the Song's copyrights on ***any*** basis,

[6] Previously, Mr. Pink had represented the defendant in a lawsuit regarding authorship and ownership of the song "Guantanamera." Gamboa Decl. ¶ 27.

[7] By contrast, the second law firm to represent the plaintiff in *Kirtsaeng* agreed to do so on a *pro bono* basis. *See John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08-cv-7834, 2013 U.S. Dist. LEXIS 179113, at *14 (S.D.N.Y. Dec. 20, 2013) (referring to lawyer's *pro bono* retainer agreement).

whether *pro bono*, contingent, hourly, or otherwise.[8] *Id*. at 32. They were willing to do so only because of their unique experience previously challenging the copyright to *Happy Birthday* in *Good Morning to You Productions Corp. v. Warner/Chappell, Inc.*, *et al.*, No. CV 13-04460-GHK (C.D. Cal.). *Id*. at ¶¶ 7 & 32. And Plaintiffs' Counsel were willing to do so only after conducting extensive research to satisfy themselves that they could successfully litigate the copyright dispute. *See* Newman Decl. ¶¶ 7-13.

As the Gamboa Decl. convincingly demonstrates, this case was ***not*** attractive to many talented lawyers for *pro bono* or reduced-fee representation. *Cf*. Doc. 164 at 21. To the contrary, the litigation was highly ***unattractive*** to other law firms, including Robins Kaplan, the firm that eventually represented the Defendants in the litigation even after it obtained the Ferrara Report laying out a roadmap for a successful copyright challenge.[9] Plaintiffs' Counsel were the only lawyers to propose a litigation strategy for invalidating the Song's copyrights, and they also offered to do so on the most favorable economic terms. Gamboa Decl. ¶¶ 7, 8, 31, 32, 34 & 36.

The Gamboa Decl. also demonstrates that Mr. Gamboa, who has worked with dozens of lawyers during his 30-year career in the music business, had no leverage to negotiate a *pro bono* or reduced fee with any of those other law firms. Gamboa Decl. ¶¶ 5 & 36. To the contrary, the ***attorneys had all the leverage*** to set the terms on which they would undertake the litigation. *Id*. at ¶ 36. Mr. Gamboa was able to retain Plaintiffs' Counsel on a contingent fee basis only because of their prior experience challenging the copyright to *Happy Birthday*. *Id*. at ¶¶ 7 & 32.

Because this issue was not addressed by the parties in the fee briefing, the Court did not

[8] Even after the case was filed, no other law firm offered to provide support or assistance to Plaintiffs' Counsel or share the risk and expense of prosecuting the case. Gamboa Decl. ¶ 36; Newman Decl. ¶ 14.

[9] The "undesirability" of a case is one of the *Johnson* factors. *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974).

have the benefit of the factual record in this case. It was left to assume – incorrectly, as it turns out – that this case would be attractive to other talented lawyers, giving Plaintiffs leverage to negotiate a *pro bono* or reduced fee. In fact, it was an unwanted "orphan" case: only Plaintiffs' Counsel were willing to prosecute the litigation at all. Contrary to the Court's assumption, Plaintiffs had no leverage to negotiate more favorable fees with any other law firms. Gamboa Decl. ¶ 36.

On the basis of this newly-submitted evidence, the Court should reconsider its decision to apply a 65% across-the-board reduction in the hourly rates charged by Plaintiffs' Counsel.[10]

**B. The Lodestar of Defendants' Counsel Does Not Justify a 65% "Across-the-Board" Reduction in the Hourly Rates of Plaintiff's Counsel**

In awarding attorney's fees, counsel's lodestar, which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case," creates a "'presumptively reasonable fee.'" *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill*, 522 F.3d at 183). Because it represents the amount of fees billed, a reasonable fee-paying client would be concerned with his or her attorney's ***lodestar*** amount, not just the lawyer's hourly rate or the total number of hours worked. In isolation, either of those amounts – the hourly rate or the number of hours worked –is meaningless. One lawyer with a slightly

[10] The Court's conclusion that Plaintiffs' Counsel's lodestar should be reduced by 65% because other qualified counsel might have agreed to represent Plaintiffs on a *pro bono* or reduced fee basis also conflicts with the Second Circuit's decision in *John Wiley & Sons, Inc. v. Kirtsaeng*, 605 F. App'x. 48 (2d Cir. 2015):

> Preventing litigants who are represented by pro bono counsel from receiving fees may decrease the future availability of *pro bono* counsel to impecunious litigants, who may, in the absence of *pro bono* representation, abandon otherwise meritorious claims and defenses. This runs counter to *Fogerty's* instruction that courts should exercise their discretion under § 505 so as to encourage the litigation of meritorious claims and defenses, because it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible.

*Id*. at 50 n.2 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994)(quotations omitted)).

higher hourly rate than another lawyer may be much more efficient, leading to a lower bill.[11] All other things being equal, a reasonable fee-paying client would be willing to pay slightly more per hour for far fewer hours, since the total amount billed by the higher-priced lawyer would be lower.

That was precisely the case here. The Court's comparison of only the regular hourly rates of Plaintiffs' Counsel – which it found were comparable with rates charged for complex commercial litigation in the Southern District of New York and to the regular hourly rates charged by Defendants' counsel (*see* Doc. 164 at 18-19) – to the reduced hourly rates charged by Defendants' counsel[12] was incomplete because it overlooked the fact that Defendants' counsel charged for ***nearly twice as many hours*** as Plaintiffs' Counsel in this case, and they did so in a losing effort. As Plaintiffs' Counsel noted in their reply papers, Defendants' counsel spent 2,767

---

[11] For example, as the Court found in the Fee Award, having the work done by two partners, "each of whom is experienced in this type of litigation, appears to have resulted in a ***net reduction in the overall hours expended on the case***, particularly in view of the amount of hours defense counsel expended." Doc. 164 at 22 (emphasis added).

[12] In the Fee Award, the Court said that "Defense counsel reduced their fees 50% in light of the defendants' history donating 50% of the royalties from the Song to charity." Doc. 164 at 20. That statement is apparently based upon a cryptic note in the Defendant's Billing Summary: "Rate charged reflects 50% pro-bono discount because of the 50% beneficial interest in the royalties of the Song paid to the charity Highlander Research and Education Center." The note, which does not claim that Defendants made any charitable contribution of their own to Highlander, was misleading at best. While Defendants' counsel reduced their hourly rates by 50%, they did not do so because ***Defendants*** were charitable.

To the contrary, as Defendants admitted in opposing summary judgment, "since its inception, [the Song] has paid ***all writer royalties*** to charity." Doc. 60 at 1 (emphasis added). Likewise, in opposing Plaintiffs' fee application, Defendants conceded that the "***writers' royalties***" were sent to Highlander, and that the "entirety of the ***writers' royalties*** for the Song since inception went to a charity." Doc. 147 at 18 & 22 n.18 (emphasis added). Defendants never claimed to have contributed 50% of their ***own*** royalties to Highlander, or to any other charity for that matter.

As the Court correctly noted elsewhere in the Fee Award, "the ***writers' portion of the royalties*** has been contributed to the Highlander Research and Education Center, a charitable fund that provides scholarships to African-American youth." *Id*. at 2-3 (emphasis added). The four purported writers shared 50% of the royalties from the Song. There is no evidence in the record that Defendants – as opposed to the writers – donated half of ***their*** income from the Song to any charity. If Defendants were charitable at all, they were charitable with someone else's money.

hours on the case, whereas Plaintiffs' Counsel spent only 1,537 hours in total. Docs. 158 at ¶ 10, 159-2, and 159-3. And of course, Defendants' counsel were paid on a current basis throughout the litigation, without any contingency on their bills.

A reasonable fee-paying client considering both sets of bills may well have concluded that Defendants' counsel over-billed the matter to compensate for the fact that they charged reduced hourly rates. There was no indication in the record that the case was more difficult for the defense than for the prosecution, or that the defense required more time-consuming factual investigation or legal research than the prosecution did. Indeed, Defendants' counsel had the advantage of having clients to provide documents and information to them, while Plaintiffs' counsel had to uncover nearly everything themselves. This inequality suggests that the case was more difficult and more-time consuming for Plaintiffs' Counsel than it was for Defendants' counsel, yet Defendants' counsel billed for nearly twice as many hours litigating the case as Plaintiffs' Counsel did. In any event, no reasonable fee-paying client would consider only the 50% reduced hourly rates charged by counsel without also taking into consideration the much higher number of hours claimed in deciding the reasonableness of the bills.

This lodestar comparison leaves apart the skill, tenacity, creativity, and experience of the lawyers vying to represent a client. A reasonable fee-paying client might be willing to pay a higher hourly rate and a higher overall fee for a lawyer with a particular skill or reputation than for a lawyer without those qualifications, regardless of the amount ultimately billed by the higher-priced lawyer. Price is but one factor in the choice of counsel. A client with an important case may be willing to pay a higher price if he or she believes that one lawyer's skill, tenacity, creativity, or experience is more likely to result in a victory.

In any event, nothing justifies cutting the hourly rates for Plaintiffs' Counsel by more

than the discount agreed to by Defendants' counsel, who billed nearly twice as many hours in a losing effort as Plaintiffs' Counsel billed in winning the case, and who were paid on a current basis while doing so without any contingent fee risk.[13]

On the basis of this practical comparison, which mimics how a reasonable client would view the bills, the Court should reconsider its decision to apply a 65% across-the-board reduction in the hourly rates charged by Plaintiffs' Counsel.

### C. The Amount Recoverable by the Class Does Not Justify a 65% "Across-the-Board" Reduction in the Hourly Rates of Plaintiff's Counsel

The amount reasonably recoverable if this case had proceeded as a common-fund class action does not justify the drastic 65% fee reduction for Plaintiff' Counsel. Doc. 164 at 20-21.

At a status conference on November 14, 2017, the Court questioned "whether [the case] should be pursued as a class action" in light of the small amount likely to be recovered by the proposed Class – only a million dollars or less. *See* Dkt. No. 113 at 2. Shortly thereafter, on December 1, 2017, Plaintiffs withdrew their class certification allegations. Dkt. No. 111. Plaintiffs elected to forego class certification and proceed promptly to trial on their individual claims to invalidate Defendants' copyrights.

As the Court acknowledged, had the case proceeded to trial as a class action, Plaintiffs' Counsel could have sought "an additional fee under Section 505." Doc. 164 at 21. While such a fee was "not a sure thing," when Plaintiffs' Counsel took on the case, it was no more or less a "sure thing" than a successful outcome for the class. In any event, whatever fees Plaintiffs'

---

[13] Another of the *Johnson* factors is whether the fee is fixed or contingent. *Johnson*, 488 F.2d at 718. Thus, the enhanced risk undertaken by Plaintiffs' Counsel, who successfully prosecuted the action on a contingent fee basis without any assurance of payment if they were unsuccessful, militates in favor of a much smaller reduction than the discount agreed to by Defendants' counsel, who bore no such risk of non-payment.

Counsel would have been paid from the common fund[14] would have been ***in addition*** to the fees awarded under Section 505. Surely, the total amount of fees paid to Plaintiffs' Counsel under both theories of recovery would have been higher than the fees awarded under Section 505 alone.

### D. The Court's Fee Award is Inconsistent With the Important Policy Considerations of Section 505

In *Kirtsaeng v. John Wiley & Sons, Inc*., 136 S. Ct. 1979 (2016), the Supreme Court held that fee awards under Section 505 should encourage the kind of lawsuits that promote the twin aims of the Copyright Act: "encouraging and rewarding authors' creations while also enabling others to build on that work." *Id.* at 1986 (citing *Fogerty*, 510 U.S. at 526-27). Under *Kirtsaeng*, a fee award may not favor one side of a copyright dispute over the other, because prevailing party fee awards should equally encourage meritorious lawsuits that promote ***both*** purposes of the Copyright Act.

Section 505 should be interpreted to encourage the kind of lawsuit that enables others to build on prior works – particularly prior works for which an undeserved copyright is claimed. The Court's decision discourages such lawsuits, and it does so despite the immense cultural and historical importance of the Song. As the Court is aware, the Song was not a commercial success. The small amount of royalty income may have been the result of Defendants' iron-fisted control over the Song.[15] But the lack of commercial success hardly diminishes the importance of the Song or the importance of this lawsuit in returning the Song to the public so that it may be used freely by others in their own works. It is precisely the kind of case that must be encouraged

[14] Because the amount of damages that may have been recovered by the proposed class was not quantified, the Court had no basis on which to approximate the amount of fees that would have been paid from a common fund recovery.

[15] The Court will recall that Defendants refused to permit WSOF to use the Song for any purpose and demanded such exorbitant fees from Butler Films that it was able to use only a few seconds the Song in the movie *Lee Daniels' The Butler*.

by the possibility of a reasonable fee for successful counsel who take it on.

As this case demonstrates, if counsel must undertake such difficult and time-consuming litigation, knowing that their fees will be cut by two-thirds even if they are successful – no matter how efficiently they prosecute an action – and that they must pay the fees of all experts – no matter how helpful those experts are to the Court's determination of the dispute – then no qualified counsel will do so except for the most obvious and commercially successful works.

In light of the important policy considerations under Section 505, the Court should reconsider its decision to apply a 65% across-the-board reduction in the hourly rates charged by Plaintiffs' Counsel.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs hereby request reconsideration or reargument of the Fee Award.

Dated: August 10, 2018

Respectfully submitted,

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: s/ Mark C. Rifkin
Mark C. Rifkin
Randall S. Newman
Gloria K. Melwani
Rifkin@whafh.com
Newman@whafh.com
Melwani@whafh.com
270 Madison Ave.
10th Floor
New York, NY 10016
(212) 545-4600

*Attorneys for Plaintiffs*